CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
DAVID MENNINGER (Bar No. 281460)
David_Menninger@fd.org
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
Fredy Stanley Cruz-Ramos

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FREDY STANLEY CRUZ-RAMOS,<br><br>Defendant. | Case No. CR 19-189-JAK<br><br>**MOTION TO DISMISS INDICTMENT UNDER EQUAL PROTECTION CLAUSE; EXHIBITS**<br><br>Date:  October 7, 2021<br>Time:  8:30 a.m. |

TO THE ACTING UNITED STATES ATTORNEY AND HER COUNSEL OF RECORD: PLEASE TAKE NOTICE THAT, on October 7, 2021 at 8:30 a.m, or as soon thereafter as may be heard, Fredy Stanley Cruz-Ramos will move to dismiss his indictment. Mr. Cruz-Ramos bases this motion on the attached memorandum, declarations, and exhibits, the files and records in this case, and any other argument or evidence that the Court may consider.

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: August 30, 2021        By  */s/ David Menninger*

DAVID MENNINGER
Attorneys for Fredy Stanley Cruz-Ramos

# **TABLE OF CONTENTS**

I.  INTRODUCTION ............................................................... …1

II.  ARGUMENT ..................................................................... 2

    A.  *Arlington Heights* governs Mr. Cruz-Ramos's challenge ............. 2

    B.  Under the *Arlington Heights* factors, racism was a "motivating factor" in the passage of the illegal reentry law ........................... 4

        1.  "The historical background of the decision" ...................... 5

        2.  "The specific sequence of events leading to the challenged action" ................................................................... 7

        3.  "The relevant legislative or administrative history" ........... 8

        4.  "The legislature's departures from normal procedures or substantive conclusions" .................................................. 14

        5.  "The impact of the official action and whether it bears more heavily on one race than another" ..................................... 16

    C.  The post-1929 recodifications of the illegal reentry law do not defeat Mr. Cruz-Ramos's claim .................................................. 17

        1.  Recodification does not affect the *Arlington Heights* analysis ...................................................................... 17

        2.  The 1952 Act, and all subsequent recodifications of the illegal-reentry law, were mere reenactments and not substantial changes ............................................................. 21

        3.  In the alternative, the illegal reentry provision in the 1952 law also satisfies the *Arlington Heights* test ...................... 22

    D.  The burden of proof shifts to the government ............................. 24

III.  CONCLUSION ................................................................. 25

# TABLE OF AUTHORITIES

*Abbott v. Perez*,
    138 S. Ct. 2305 (2018)....................................................................18, 19, 20, 21

*Arce v. Douglas*,
    793 F.3d 968 (9th Cir. 2015) ...................................................................*passim*

*Ave. 6E Investments, LLC v. City of Yuma, Ariz.*,
    818 F.3d 493 (9th Cir. 2016) ................................................................7, 14, 16

*Bear Lake & River Waterworks & Irrigation Co. v. Garland*,
    164 U.S. 1 (1896).............................................................................................17

*Buck v. Bell*,
    274 U.S. 200 (1927)...........................................................................................6

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
    140 S.Ct. 1891 (2020)........................................................................................4

*Espinoza v. Montana Dep't of Revenue*,
    140 S. Ct. 2246 (2020)...............................................................................19, 20

*Fourco Glass Co. v. Transmirra Products Corp.*,
    353 U.S. 222 (1957).........................................................................................17

*Hunter v. Underwood*,
    471 U.S. 222 (1985)..................................................................................*passim*

*La Union del Pueblo Entero v. Ross*,
    353 F. Supp. 3d 381 (D. Md. 2018)................................................................22

*Loving v. Virginia*,
    388 U.S. 1 (1967)...............................................................................................2

*Oneida County v. Oneida Indian Nation of New York State*,
    470 U.S. 226 (1985)....................................................................................17, 19

*Pac. Shores Properties, LLC v. City of Newport Beach*,
    730 F.3d 1142 (9th Cir. 2013) ........................................................................14

*Ramos v. Louisiana*,
    140 S. Ct. 1390 (2020)................................................................1, 19, 20

*Ramos v. Wolf*,
    975 F.3d 872 (9th Cir. 2020) ...............................................................4

*Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*,
    908 F.3d 476 (9th Cir. 2018) ............................................................3, 4

*Sessions v. Morales-Santana*,
    137 S. Ct. 1678 (2017).........................................................................2

*United States v. Machic-Xiap*,
    2021 WL 3362738 (D. Or. Aug. 3, 2021) .....................................1, 22

*Village of Arlington Heights v. Metropolitan Housing Development
    Corp.*,
    429 U.S. 252 (1977)..................................................................*passim*

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886).............................................................................2

# I.INTRODUCTION

In April 2020, the Supreme Court relied on historical evidence of a state legislature's racial motives to strike down a criminal law enacted a century earlier. *See Ramos v. Louisiana*, 140 S. Ct. 1390 (2020). Although the law was later reenacted with no evidence of animus, the Court refused to ignore the "racially discriminatory *reasons* that [the state] adopted [its] peculiar rules in the first place." *Id.* at 1401 (emphasis in original).

Like the law in *Ramos*, the law criminalizing illegal reentry into the United States at 8 U.S.C. § 1326 has an "uncomfortable past" that must be examined. *Id.* Enacted at the height of the eugenics movement, the "Undesirable Aliens Act of 1929"—the original version of the law that Fredy Stanley Cruz-Ramos is charged with violating—was conceived, drafted, and enacted by white supremacists out of a belief that the "Mexican race" would destroy the racial purity of the United States. Legislators referred to Mexicans as "mongrels" and "peons." They claimed Mexicans were "poisoning the American citizen." They sought to keep the country's blood "white and purely Caucasian." They solicited reports and testimony from a eugenicist who likened immigration policy to the "breed[ing] of thoroughbred horses." Not only did this racism underlie the original version of § 1326, the law has disparately impacted Latinos in the century since.

Applying Supreme Court precedent to this shocking history, a District Court in the District Court of Nevada recently held that § 1326 violates the constitutional guarantee of Equal Protection, requiring dismissal of the indictment. *United States v. Carrillo-Lopez*, CR 20-26-MMD (D. Nev. August 18, 2021).[1] Because the facts and

---

[1] A copy of the *Carillo-Lopez* decision is attached as Exhibit S. Faced with the same question, other District Courts have reached the opposite conclusion. *See, e.g.*, *United States v. Machic-Xiap*, 2021 WL 3362738 (D. Or. Aug. 3, 2021); *United States v. Medina-Zepeda*, ECF 33, CR 20-57-FMO (C.D. Cal. Jan. 5, 2021).

1

historical evidence presented here show that the original illegal reentry law was enacted with a discriminatory purpose and still has a disparate impact, this Court should join the *Carrillo-Lopez* Court and hold § 1326 is unconstitutional under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). At a minimum, this Court should schedule an evidentiary hearing at which Mr. Cruz-Ramos will present expert testimony as further evidence of the law's discriminatory origins.

## II. ARGUMENT

### A.    *Arlington Heights* governs Mr. Cruz-Ramos's challenge

The Fifth Amendment of the Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. This clause contains an implicit guarantee of equal protection in federal laws identical to what the Fourteenth Amendment guarantees in state laws. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017). A law may violate equal protection in three ways. First, a law may discriminate on its face. *See*, *e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967). Second, authorities may apply a facially neutral law in a discriminatory way. *See*, *e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). Third, a legislature may enact a facially neutral law with a discriminatory purpose, which disparately impacts a disfavored group. *See*, *e.g.*, *Arlington Heights*, 429 U.S. at 265-68.

Here, Mr. Cruz-Ramos challenges § 1326 under the third rationale, so the legal framework of *Arlington Heights* applies. *Arlington Heights* clarified that the *effect* of a racially discriminatory law does not alone make it unconstitutional—challengers must also show "[p]roof of racially discriminatory intent or purpose" at the time of the law's passage. *Id*. at 265. Determining whether a purpose was discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id*. at 266. *Arlington Heights* gave a non-exhaustive list of relevant factors

to consider in this determination, including:

1. the impact of the official action and whether it bears more heavily on one race than another;

2. the historical background of the decision;

3. the specific sequence of events leading to the challenged action;

4. the [legislature's] departures from normal procedures or substantive conclusions; and

5. the relevant legislative or administrative history.

*Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (citing *Arlington Heights*, 429 U.S. at 266-68).

The threshold for satisfying these factors is low. Since legislatures are rarely "motivated solely by a single concern," a challenger need not show that the legislature's actions "rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265-66. Instead, the challenger need only show "proof that a discriminatory purpose has been a *motivating factor* in the decision." *Id.* at 265–66 (emphasis added). *See also Arce*, 793 F.3d at 977 (quoting *Arlington Heights* to hold that a challenger need not prove discrimination was the "sole purpose" of the challenged action—only that it was a "'motivating factor'").

Once the challenger shows that discriminatory purpose was a "motivating factor," the burden shifts to the law's defender to show that "the same decision would have resulted even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270 n.21; *see also Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (if racial discrimination was a motivating factor, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor."). If the government cannot show that the legislature would have enacted the offending law in the "absence of the racially discriminatory motivation," the law violates the Fifth Amendment and must be invalidated. *Id*. at 225.

3

1   The government may argue that Congress's authority over immigration gives it

2   free reign to racially discriminate against noncitizens, meaning that §1326 must stand

3   even if this Court agrees that it was enacted in order to discriminate against Latinos.

4   This argument, thankfully, is contradicted by Ninth Circuit precedent, which makes

5   clear that—within the boundaries of the United States—Equal Protection's prohibition

6   on racial discrimination applies equally to noncitizens and citizens alike. In *Regents of*

7   *the Univ. of California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 518-20 (9th Cir.

8   2018), the Ninth Circuit applied *Arlington Heights* to find that the plaintiffs had stated

9   a viable claim that anti-Latino prejudice was a motivating factor in the termination of

10  DACA. On appeal, at least five members of the Supreme Court agreed that *Arlington*

11  *Heights* applied, but ultimately rejected the plaintiffs' claim on its facts. *Dep't of*

12  *Homeland Sec. v. Regents of the Univ. of California*, 140 S.Ct. 1891, 1915-16 (2020);

13  *see also id.* at 1917-18 (Sotomayor, J., concurring and dissenting). Following the

14  Supreme Court's opinion in *Regents*, the Ninth Circuit again reaffirmed that the

15  traditional *Arlington-Heights* analysis applied to a racial-discrimination challenge to

16  an immigration administrative action. *Ramos v. Wolf*, 975 F.3d 872, 895-896 (9th Cir.

17  2020) (citing *Regents*, 140 S.Ct. at 1915; *Regents*, 908 F.3d at 519-20; *Zadvydas v.*

18  *Davis*, 533 U.S. 678, 693 (2001) ("The distinction between an alien who has effected

19  an entry into the United States and one who has never entered runs throughout

20  immigration law . . . . [O]nce an alien enters the country, the legal circumstance

21  changes, for the Due Process Clause applies to all 'persons' within the United States,

22  including aliens, whether their presence here is lawful, unlawful, temporary, or

23  permanent.")). As such, *Arlington Heights* governs the constitutionality of §1326.

**B.    Under the *Arlington Heights* factors, racism was a "motivating factor"
         in the passage of the illegal reentry law**

24  Congress first made illegal reentry a crime in 1929. That law provided in

25  relevant part that, "if any alien has been arrested and deported in pursuance of law …

26

27

28

4

and if he attempts to enter the United States … he shall be guilty of a felony [.]" Senate Bill 5094, Public Law 1018 (March 4, 1929), attached as Exhibit L. The penalty was up to two years imprisonment.[2] A close examination of the political context underlying the passage of this 1929 law reveals a disturbing truth: racism against Latinos or the "Mexican race"[3] was not only a "motivating factor" in the legislature's passage of this law. *Arlington Heights*, 429 U.S. at 265. It was the *primary* factor.

### 1.    "The historical background of the decision"

Historians often refer to the 1920s as the "Tribal Twenties"—a time when "the Ku Klux Klan was reborn, Jim Crow came of age, and public intellectuals preached the science of eugenics." Exhibit A, Report of Dr. Kelly Lytle Hernández, Professor of History at the University of California, Los Angeles at 2. World War I had produced "a feverish sentiment against presumably disloyal 'hyphenated Americans,'" and "few could resist the combination of nativism, job scarcity, and anti-Bolshevism that fueled the politics of restriction."[4] Prominent restrictionists "spoke increasingly of 'racial indigestion,'"[5] and "the 'contamination' of Anglo-American society."[6]

---

[2] The relevant section read, in its entirety:  "[I]f any alien has been arrested and deported in pursuance of law, he shall be excluded from admission to the United States whether such deportation took place before or after the enactment of this Act, and if he enters or attempts to enter the United States after the expiration of sixty days after the enactment of this act, he shall be guilty of a felony and upon conviction thereof shall, unless a different penalty is otherwise expressly provided by law, be punished by imprisonment for not more than two years or by a fine of not more than $1,000, or by both such fine and imprisonment."  Pub. L. No. 70-1018 § 1, 45 Stat. 1551.

[3] In the early 20th century, "Mexican" was conceptualized as a race rather than a nationality. For instance, the 1930 census listed "Mexican" as a "Color or Race." United States Census Bureau, *History: 1930*, https://www.census. gov/history/www/through_the_decades/index_of_questions/1930_1.html. And "[f]rom at least 1846 until as recently as 2001 courts throughout the United States have utilized the term 'Mexican race' to describe Latinos." Lupe S. Salinas, *Immigration and Language Rights: The Evolution of Private Racist Attitudes into American Public Law and Policy*, 7 Nev. L.J. 895, 913 (2007).

[4] Mae M. Ngai, *Impossible Subjects*, 19, 20 (2004 William Chafe, et al.).

[5] *Id*. at 23.

[6] Kelly Lytle Hernández, *Migra!: A History of the U.S. Border Patrol*, 28 (2010).

5

The decade also brought a flood of immigration legislation fueled by fears of "non-white" immigration.[7] Many politicians, especially those popularly known as "nativists," hoped to "restrict and even end immigration to the United States from every region of the world other than western Europe." Exh. A, Hernández Rep. at 2. At the start of the decade, Congress passed the first numerical restriction on immigration in the United States.[8] During the remainder of the decade, legislators aimed for "'America [to] cease to be the melting pot.'"[9] Although the arrival of southern and eastern Europeans in the early 1900s "fueled the rise of American manufacturing," nativists saw these groups as "'undesirable immigrants'" who were "socially inferior, culturally alien, and politically suspect."[10]

These fears of non-white immigration were bolstered by the growing acceptance of eugenics—a theory that "captured the imagination of many of America's leading intellectuals."[11] At the center of the eugenics movement was Dr. Harry H. Laughlin, the director of the Eugenics Record Office.[12] Dr. Laughlin was well known for his model sterilization law that many states and countries, including the Third Reich of Nazi Germany, used as a template.[13] During the 1920s, Dr. Laughlin testified before Congress multiple times and produced four reports that discussed topics such as "race crossing," "mate selection," "fecundity," "racial composition," and the "individual quality of future population." Exhibit B, *The Eugenical Aspects of Deportation: Hearings before the Committee on Immigration*

---

[7] *See generally* Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants Out of America* (2019).
[8] Emergency Immigration Act of 1921, Pub.L. 67-5, 42 Stat. 5 (1921).
[9] Jia Lynn Yang, *One Mighty and Irresistible Tide: The Epic Struggle Over American Immigration*, 2020, 3 (2020) (quoting Senator David A. Reed).
[10] Hernández, *supra*, at 28.
[11] Yang, *supra*, at 35.
[12] Ngai, *supra*, at 24.
[13] *Harry Laughlin and Eugenics*, Truman State University. Accessible at https://historyofeugenics.truman.edu/altering-lives/sterilization/model-law/.

*and Naturalization House of Representative*, 70th Cong. 70.1.4 , pp. 2, 3 (1928). Relying heavily on these theories, Congress would anchor its immigration legislation in eugenics and racial inferiority for the remainder of the decade.[14]

### 2. "The specific sequence of events leading to the challenged action"

In the early 1920s, Congress began to focus its legislation around the exclusion of "undesirable" immigrants—which was often code for non-white. *See Ave. 6E Investments, LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 505-06 (9th Cir. 2016) (holding that "the use of 'code words' may demonstrate discriminatory intent"). The first such law was the National Origins Act of 1924, which established quotas based on the national origins of U.S. citizens as reflected in the 1920 census.

The quotas created by the National Origins Act were skewed to keep the nation's "racial strains" predominantly Anglo-Saxon.[15] The law on its face did not count "nonwhite people residing in the United States" toward the quotas it established. Indeed, its newly-created "Quota Board" interpreted this provision to exclude all Black people; all East and South Asians (including those who had American citizenship by birth); and all citizens in Hawai'i, Puerto Rico, and Alaska.[16] Congress and the president accepted these exclusions under pressure to "stand firm against the efforts of 'hyphenates' who would 'play politics with the nation's blood stream.'"[17] Yet there was a wrinkle in the National Origins Act—it did not set quotas on immigrants from countries in the Western Hemisphere. This was due to the influence of large agricultural businesses that relied heavily on labor from just over the border.[18] These agri-businesses pressured legislators from western states to vote against the law,

---

[14] *See* E.P. Hutchinson, *Legislative History of American Immigration Law, 1798-1965*, 212-13 (1981).
[15] Ngai, *supra*, at 24–25.
[16] *Id.* at 26.
[17] *Id.* at 35.
[18] *See* Hans P. Vought, *The Bully Pulpit*, 179 (2004)..

forcing nativists in Congress to "choose between accepting a Mexican quota exemption or passing no immigration law at all." Exh. A, Hernández Rep. at 3. As one representative complained, there was no chance of capping the number of Mexican immigrants because growers were too "interested in the importation of these poor peons." Exhibit C, Representative Box (TX). "Deportation of Aliens." *Congressional Record*, (Feb. 16, 1929) p. H3619.

So despite passing the most sweeping immigration law in years, legislators were not happy. Representative Madden grumbled that the bill "leaves open the doors for perhaps the worst element that comes into the United States—the Mexican peon."[19] Representative Patrick O'Sullivan criticized the restrictions on Italian immigrants, stating that "the average Italian is as much superior to the average Mexican as a full-blooded Airedale is to a mongrel." Exhibit E, Representative O'Sullivan, "Administration of the Law." *Congressional Record* 65:6 (1924) p. H5900. Legislators "proposed bill after bill" restricting Mexican immigration but none could survive opposition from southwestern growers. Exh. A, Hernández Rep. at 5. To solve this problem, a group of key figures began to strategize a new type of immigration bill that would approach immigration from a criminal—rather than a civil—angle.

### 3.    "The relevant legislative or administrative history"

After passage of the National Origins Act of 1924, the Department of Labor (which governed the Bureau of Immigration) began implementing Congress's new quota system.[20] Then-Secretary of Labor James Davis was a strong advocate of Dr. Laughlin and his eugenics theories—even using them as the basis for policies he had developed and published under the title "Selective Immigration or None."[21] Davis

---

[19] Benjamin Gonzalez O'Brien, Chap. 1, *Handcuffs and Chain Link* (2018).
[20] *See* Vought, *supra*, at 174–79.
[21] *Id.*

8

warned that the "rat type" was coming to the United States, and that these "rat men" would jeopardize the American gene pool.[22]

Secretary Davis was nevertheless torn between his belief in eugenics and his responsibility to maintain a large labor supply for the railroad and agriculture industries.[23] So together with devout racist (and suspected Ku Klux Klan member) Senator Coleman Blease,[24] Davis developed a compromise—Congress would criminalize border crossing *after the fact*, rather than *prevent* it in the first place.[25] That way, they reasoned, authorities could expel Mexicans through a criminal prosecution after the growing season was over, thereby avoiding resistance from businesses that depended on Mexican labor.[26] The southwest growers were in agreement—as one put it, "We, in California, would greatly prefer some set up in which our peak labor demands might be met and upon the completion of our harvest these laborers returned to their country." Exh. A, Hernández Rep. at 7.

Secretary Davis and Senator Blease found two eager collaborators in the House of Representatives, both of whom were on the powerful Immigration and Naturalization Committee. Representative John C. Box from Texas had long characterized the goal of immigration law as "the protection of American racial stock from further degradation or change through mongrelization." Exhibit E, Representative Box (TX). "Restriction of Mexican Immigration," *Congressional Record*, (Feb. 9, 1928) pp. H2817–18. In one speech at an immigration conference, Rep. Box had explained that

---

[22] *Id*. at 174–75.
[23] *Id*. at 216.
[24] For biographical and historical context about Senator Blease, *see* B. Simon, *The appeal of Cole Blease of South Carolina: Race, Class, and Sex in the New South*, The Journal of Southern History, 62:1, pp. 57-86 (Feb. 1996), *available at* http://www.jstor.org/stable/2211206.
[25] Ian MacDougall,, *Behind the Criminal Immigration Law: Eugenics and White Supremacy*, ProPublica (June 19, 2020), https://www.propublica.org/article/behind-the-criminal-immigration-law-eugenics-and-white-supremacy.
[26] *Id*.

> [t]he Mexican peon is a mixture of Mediterranean-blooded Spanish peasant with low-grade Indians who did not fight to extinction but submitted and multiplied as serfs. Into that was fused much negro slave blood….The prevention of such mongrelization and the degradation it causes is one of the purposes of our [immigration] laws.

*Id*. Box believed this importation was "raising a serious race question" because Mexicans were "essentially different from us in character, in social position." Exh. C at H3619.

Box was joined by the influential Chairman of the House Immigration and Naturalization Committee, Representative Albert Johnson of Washington. Chairman Johnson—for whom the 1924 "Johnson-Reed" National Origins Act was named—was an "energetic and vehement racist and nativist."[27]  He headed the Eugenics Research Association, a group that opposed interracial marriage and supported forced sterilizations.[28] He also proudly described his 1924 law as a "bulwark against 'a stream of alien blood, with all its inherited misconceptions respecting the relationships of the governing power to the governed."[29] Within two years of the 1924 Act, Chairman Johnson turned to legislation that would exclude the "Mexican race," explaining that while the argument for immigration restriction had previously been economic, now "'the fundamental reason for it is biological.'"[30]

Following the lead of these legislators, other lawmakers soon "turned to narratives of racial threat to justify restriction."[31] In 1928, for instance, Representative Robert A. Green of Florida delivered a radio speech (later read into the congressional record by Representative Lankford) that advocated for Western Hemisphere quotas. He asserted that countries south of the United States are "composed of mixture blood

---

[27] Dennis Wepman, *Immigration: From the Founding of Virginia to the Closing of Ellis Island*, p. 242-43 (2002).
[28] *Id.*
[29] Roger Daniels, *Guarding the Golden Door*, p. 55 (Hill and Wang, 2004).
[30] Okrent, *supra*, at 3.
[31] Gonzalez O'Brien, *supra*, at Chap. 1 (Kindle edition).

of White, Indian, and negro." Exhibit F, Representative Lankford. "Across the Borders." *Congressional Record* (Feb. 3, 1928) p. H2462. Immigration from these countries, he believed, created a "very great penalty upon the society which assimilates," and put it at a disadvantage to countries that have "kept their blood white and purely Caucasian." Exh. F, at H2462.

Chairman Johnson soon convened hearings on new immigration legislation. *See* Exhibit G, *Hearings Before the Committee on Immigration and Naturalization*, 69th Cong. 69.1.3 (1926). At the first hearing, Chairman Johnson admitted into the record a letter from a constituent in El Paso who urged the legislators to keep out "the scoff and scum, the mongrel, the bootlegger element, from Mexico." Exh. G, at 30. In response to this letter, Commissioner General of Immigration Harry Hull, stated, "I think he is right." Exh. G, at 30. Rep. Box added, "I have some letters, Mr. Chairman, just like that." Exh. G, at 30

The following month, the same House committee held a hearing on "The Eugenical Aspects of Deportation," where the principal witness was the well-known eugenicist Dr. Laughlin. Exh. B, at 1. Early in the hearing, Chairman Johnson praised Dr. Laughlin's prior reports to Congress on race crossing, mate selection, and fecundity, describing one as a "priceless" resource that would "bear intimately on immigration policy." Exh. B, at 3. Dr. Laughlin testified about his latest eugenics report, the goal of which was to "protect American blood from alien contamination." Exh. B, at 3. When Dr. Laughlin encouraged the committee to conduct future research on the effect of "race crossing within the United States," Chairman Johnson replied that such a study would "be of great use to the committee in its deliberations." Exh. B, at 11. Dr. Laughlin discussed the need for further research into "mate selection," because "whenever two races come in contact there is always race mixture" even though the "upper levels tend to maintain themselves because of the purity of the women of the upper classes." Exh. B, at 19. The job of any government, Dr. Laughlin

explained, was to "demand fit mating and high fertility from the classes who are better endowed physically, mentally, and morally by heredity." Exh. B, at 19. By deporting or excluding the "lower races" from the country, Dr. Laughlin contended, "[i]mmigration control is the greatest instrument which the Federal Government can use in promoting race conservation of the Nation." Exh. B, at 19.

In response, Chairman Johnson advocated for Congress's use of the "principle of applied eugenics" to "do everything possible" to reduce crime by "debarring and deporting" more people. Exh. B, at 25. Rep. Box agreed, stating, "we will have to control immigration to suit our own needs or we will lose our national character," which would "spell destruction for the future of America." Exh. B, at 25.

Dr. Laughlin even compared the drafters of deportation laws to "successful breeders of thoroughbred horses," who would never consider "acquiring a mare or a stallion not of the top level" for their "stud farm." Exh. B, at 44. One such successful breeder he knew "weeds out from the lower levels and recruits by purchase"—a process that is "analogous to immigration in man." Exh. B, at 44–45. "Man is an animal," Dr. Laughlin explained, "and so far as heredity and future generations are concerned, there is considerable real basis for [this] comparison." Exh. B, at 45. When such racial engineering is not possible, Dr. Laughlin warned, deportation of the "undesirable individual" becomes even more critical; otherwise, "we cannot get rid of his blood no matter how inferior it may be, because we cannot deport his offspring born here." Exh. B, at 45. Dr. Laughlin predicted that so long as the nation's borders remained open to immigrants, "there will always be need for deportation, or the 'final selection.'" Exh. B, at 44. In response to this testimony, Chairman Johnson agreed that "[i]mmigration looks more and more like a biological problem, and if the work of this committee results in establishing this principle in our immigration policy we will be well repaid for our efforts." Exh. B, at 46.

Though Chairman Johnson's initial legislation failed, the compromise with the

12

agricultural industry brokered by Secretary Davis and Senator Blease soon made a breakthrough. On January 18, 1929, Senator Blease, on behalf of the Senate Committee on Immigration, submitted a report to the full Senate recommending passage of a law that would penalize "aliens who have been expelled from the United States and who reenter the country unlawfully." Exhibit H, S. Rep. No. 1456, at 1 (1929). This report was accompanied by a letter from Secretary Davis on behalf of the Department of Labor advocating for passage of the law. Exh. H, at 2.

The following week, Senator Blease presented this bill on the Senate floor, where he reported that Chairman Johnson had "asked me to get the measures over to the House [within two days] if I possibly could." Exhibit I, Senator Blease (SC). *Congressional Record* (Jan. 23, 1929) p. S2092. The full Senate passed the bill with almost no discussion or debate. *Id.* Two weeks later, Chairman Johnson submitted a report from the Committee of Immigration and Naturalization to the full House recommending passage of the illegal reentry law. Exhibit J, S. Rep. No. 2397 (1929).

During debate on the bill, Rep. Thomas L. Blanton complained that Mexicans "come into Texas by hordes" and that "my friend Judge Box has been making a just fight against this situation for years." Exh. C, Cong. Rec. 1929. Rep. Blanton urged the House to "apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them there." Exh. C, Representative Blanton, "Deportation of Aliens." *Congressional Record* (1929) p. H3619. Rep. Schafer added that "[t]hese Mexicans also come into Wisconsin in droves," and Rep. Blanton challenged others to visit the international ports of entry in Texas to see the "hordes that come across the bridges with no intention of ever going back." Exh. C, at H3619. Rep. Fitzgerald then added that from a "moral standpoint," Mexicans were "poisoning the American citizen" because they are "of a class" that is "very undesirable." Exh. C, Representative FitzGerald, "Deportation of Aliens." *Congressional Record* (1929) p. H3620. Minutes later, the bill passed the House of

Representatives. Exh. C, H3621. The president signed it so-called "Undesirable Aliens Act" into law three days later. Exhibit L, 70th Cong., Sess. II, Chap. 690, Mar. 4, 1929; *see also* Exh. K at 3542 (statement of Representative Johnson stating that the House Committee named the bill "The Undesirable Aliens Act of 1929").

This legislative history easily clears the low threshold of showing that racism and eugenics were a "motivating factor" under the first three factors. Like other *Arlington Heights* cases, passage of the racially-motivated law followed a predictable pattern. A broad social movement founded on principles of white supremacy and eugenics gained popular support in the 1920s. *Compare Hunter*, 471 U.S. at 229 (discussing "a movement that swept the post-Reconstruction South to disenfranchise blacks"). Dr. Laughlin, a notorious eugenics "expert," promoted theories of racial inferiority through multiple reports and testimony to Congress. Key lawmakers like Chairman Johnson, Senator Blease, and Representative Box (along with Secretary of Labor Davis) promoted these theories and repeatedly endorsed them during legislative sessions. *See Arce*, 793 F.3d at 978–79 (legislators accused ethnic studies program of inciting "racial warfare"). And even Congressmen who might not have otherwise endorsed racially motivated legislation were consistently advised of the "inferiority" of the "Mexican race" during legislative sessions in the five years leading up to the law's passage. In other words, the evidence of racial discrimination in the legislative history and events leading up to the passage of the 1929 law easily meets—if not exceeds—the evidence in other *Arlington Heights* cases where race was found to be a "motivating factor."

### 4.    "The legislature's departures from normal procedures or substantive conclusions"

Examining the fourth *Arlington Heights* factor—whether a decisionmaker departs from "normal procedures or substantive conclusions"—requires courts to consider any "procedural irregularities" leading up to the enactment of a law that

14

1   could signal a discriminatory intent. *Pac. Shores Properties, LLC v. City of Newport*

2   *Beach*, 730 F.3d 1142, 1164 (9th Cir. 2013). Courts may also consider illogical or

3   counter-intuitive conclusions in the decision-making process. *See, e.g.*, *Ave. 6E*

4   *Investments, LLC v. City of Yuma*, 818 F.3d 493, 507 (9th Cir. 2016) (citing the city's

5   decision to "disregard the zoning advice of its own experts"). Here, not only do the

6   overtly racist statements of legislators during the law's passage show its

7   discriminatory purpose, several irregularities and illogical conclusions in the passage

8   of the 1929 law also implicate this factor.

9       First, the 1920s Congress openly relied on the now-discredited theory of

10  eugenics to enact immigration legislation. Both the 1924 and 1929 immigration laws

11  drew heavily on Dr. Laughlin's debunked beliefs that immigration control was a

12  matter of racial engineering, akin to horse breeding. And while Congress ultimately

13  acknowledged the discriminatory origins of the National Origins Act of 1924 and

14  repealed it in 1965,[32] illegal reentry remains one of the few laws still in effect from

15  that era. Second, the racial vitriol expressed during the debates was directed almost

16  exclusively at Mexicans—even though Canadians were also entering the United States

17  in record numbers. *See* Exh. C, at H3621 (stating that 81,506 Canadians entered the

18  United States in 1928). If the 1929 Act were motivated by generalized xenophobia or

19  economic anxiety, rather than racism, one would expect legislators to criticize

20  foreigners across the board. But no legislator referred to Canadians as "mongrels";

21  none complained of "hordes" of Canadians crossing the border; none objected that

22  Canadians were "poisoning the American citizen." And a representative from

23  Wisconsin complained only about *Mexicans* taking jobs, not Canadians. *See* Exh. C,

24

25

26  [32] *See* Immigration and Nationality Act of 1965, Pub. L. 89–236 (abolishing the National Origins Formula); Gabriel J. Chin, *The Civil Rights Revolution Comes to Immigration Law: A New Look at the Immigration and Nationality Act of 1965*, 75 N.C. L. Rev. 273, 301 (1996) (noting Congress' "racial egalitarian motivation" for repealing the National Origins Act).

27

28

at H3619. These irregularities show that not only was Congress's passage of the Undesirable Aliens Act based on eugenics and racism, it also departed from typical substantive conclusions underlying immigration law.

### 5.    "The impact of the official action and whether it bears more heavily on one race than another"

Within a year of the 1929 law's passage, the government had prosecuted 7,001 border crossing crimes; by 1939, that number rose to over 44,000.[33] In each of these years, individuals from Mexico comprised no fewer than 84% of those convicted, and often made up as many as 99% of defendants.[34] That lopslided impact remains to this day: in 2019, fully 99% of people prosecuted for illegal reentry were Latino.[35] And the number of prosecutions has soared—in the last three years, the number of § 1326 cases has risen by nearly 40% to 22,077,[36] making illegal reentry one of the most common federal felonies today.

Overall, these disparities are comparable to disparities that have supported successful *Arlington Heights* challenges. *See, e.g.*, *Ave. 6E Investments*, 818 F.3d at 497 (concentrating most low-income housing in neighborhoods that are 75% Hispanic); *Arce*, 793 F.3d at 978 (targeting a program, 90% of whose enrollees were of Mexican or other Hispanic origin); *Comm. Concerning Community Improvement v. Modesto*, 583 F.3d 690, 704 (9th Cir. 2009) (excluding 71% Latino areas from benefits, while extending those benefits to other areas that were only 48% Latino).

In sum, applying the five *Arlington Heights* factors shows that racism and eugenics were, at minimum, a "motivating factor" in the passage of the Undesirable

---

[33] *Annual Report of the Attorney General of the United States for the Fiscal Year 1939*, 37; Kelly Lytle Hernández, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles, 1771-1965*, n.6 at 138–39 (UNC Press, 2017).
[34] Hernández, *supra* n.6, at 138–39 (citing U.S. Bureau of Prisons, *Federal Offenders*, Fiscal Years, 1931–36.
[35] *See* United States Sentencing Commission, *Quick Facts: Illegal Reentry Offenses*, Fiscal Year 2019, *available at*: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY19.pdf.
[36] *See id.*

16

1  Aliens Act.

2  **C.   The post-1929 recodifications of the illegal reentry law do not defeat Mr. Cruz-Ramos's claim**

3       The government may argue that, no matter how racially discriminatory the

4  original criminalization of illegal reentry, it is of no moment because the offense has

5  been subsequently recodified—first as part of the McCarran-Walter Act of 1952, and

6  several times since.[37] That argument is wrong. Supreme Court precedent holds that the

7  mere reenactment or recodification of a law, without any substantial changes, does not

8  shift *Arlington Heights* analysis from the original law. And that is what happened with

9  illegal reentry in the McCarran-Walter Act: Congress explicitly "reenacted" the law

10  with the intent of "carry[ing] forward" its original effect. As such, the Court's focus

11  should remain on the 1929 law. But even if this Court instead looks to the 1952 law,

12  the *Arlington Heights* factors indicate that racial prejudice was a motivating factor of

13  § 1326.

14       **1.   Recodification does not affect the *Arlington Heights* analysis**

15       Under Supreme Court precedent, the mere reenactment of a discriminatory

16  statute by a subsequent legislature does not cleanse the constitutional problem.

17  Although the 1929 law has been reenacted and recodified several times, Congress has

18  never acknowledged—let alone reckoned with—the law's racist roots. Rather, the

19  reenactments have, at best, carried forward the original racist intent of the 1929

20  Congress, as the only substantive changes to the law have either made it easier to

21  prosecute or increased its penalty. As such, the proper focus of the *Arlington Heights*

22  analysis remains the 1929 law.

23

24
25
26
27
---
[37] *See* June 27, 1952, c. 477, Title II, ch. 8, § 276, 66 Stat. 229; Pub.L. 100-690, Title VII, § 7345(a), Nov. 18, 1988, 102 Stat. 4471; Pub.L. 101-649, Title V, § 543(b)(3), Nov. 29, 1990, 104 Stat. 5059; Pub.L. 103-322, Title XIII, § 130001(b), Sept. 13, 1994, 108 Stat. 2023; Pub.L. 104-132, Title IV, §§ 401(c), 438(b), 441(a), Apr. 24, 1996, 110 Stat. 1267, 1276, 1279; Pub.L. 104-208, Div. C, Title III, §§ 305(b), 308(d)(4)(J), (e)(1)(K), (14)(A), 324(a), (b), Sept. 30, 1996, 110 Stat. 3009-606, 3009-618 to 3009-620, 3009-629.

28

The Supreme Court has instructed that a Court should read a recodification of a statute as a continuation of the original statute where, as here, there is no "clearly expressed" intention to "change their effect" or "alter[] the scope and purpose" of the enactments. *See Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 227 (1957). In *Bear Lake & River Waterworks & Irrigation Co. v. Garland*, 164 U.S. 1 (1896), for example, the Supreme Court explained that a statutory repeal and recodification has no impact on the intended effect of the substantive provisions that remain the same:

> Upon comparing the two acts of 1888 and 1890 together, it is seen that they both legislate upon the same subject, and in many cases the provisions of the two statutes are similar, and almost identical. Although there is a formal repeal of the old by the new statute, still there never has been a moment of time since the passage of the act of 1888 when these similar provisions have not been in force. Notwithstanding, therefore, this formal repeal, it is, as we think, entirely correct to say that the new act should be construed as a continuation of the old with the modification contained in the new act.

164 U.S. at 11-12 (citing *Pac. Mail S.S. Co. v. Joliffe*, 69 U.S. 450, 458 (1864) ("The new act took effect simultaneously with the repeal of the first act; its provisions may, therefore, more properly be said to be substituted in the place of, and to continue in force with modifications, the provisions of the original act, rather than to have abrogated and annulled them")). Ninety years later, in *Oneida County v. Oneida Indian Nation of New York State*, 470 U.S. 226 (1985), the Supreme Court articulated the same standard, citing the same cases, when interpreting the federal Nonintercourse Act, *id.* at 246 & n.18. The upshot of these decisions is that, "when an existing statute is reenacted by a later statute in substantially the same terms," the "unchanged provisions which are repeated in the new enactment are construed to have been continuously in force." 1A N. Singer & J. Singer, *Statutes and Statutory Construction* (7th ed. 2009) § 23:29.

Given these longstanding principles governing the interpretations of statutory recodifications, the Supreme Court has repeatedly held that recodifications or minor

18

alterations to a discriminatory statute do not launder the statute's discriminatory history. In *Hunter v. Underwood*, 471 U.S. 222, 232 (1985), the Supreme Court held that an 80-year-old, facially-neutral voting restriction in the Alabama Constitution was enacted with racist intent, thus violating Equal Protection. The Court rejected the state's argument that "events occurring in the succeeding 80 years" after the original enactment, including court decisions striking down the "more blatantly discriminatory" terms of the statute, had "legitimated the provision." *Id.* at 232-233. No matter that the provision no longer contained the exact terms selected by the racially-motivated legislature, the Court held that it "violate[d] equal protection under *Arlington Heights*" because "its original enactment was motivated by a desire to discriminate against [B]lacks on account of race and the section continues to this day to have that effect." *Id.*

Although some courts have misread *Abbott v. Perez*, 138 S. Ct. 2305 (2018), that case did nothing to disturb *Hunter*'s rule. *Abbot*t, which had a complicated procedural history, involved a challenge to Texas's 2013 legislative redistricting maps. The District Court had initially struck down maps passed by the Texas legislature in 2011 as racially discriminatory. *Id.* at 2315-16. As a result, a three-judge District Court drew up its own interim maps for a fast-approaching election. Although the District Court ultimately paid some deference to the legislative judgments reflected in the 2011 map, the resulting court-drawn map "departed significantly from the State's 2011 plans": approximately 25% of the Congressional districts, and 21 of the state house districts were "substantially changed." *Id.* at 2316-17. The Texas legislature adopted this court-drawn map in 2013. *Id.* at 2317. But after those 2013 maps were challenged, the District Court found that the 2013 maps— which the District Court had drawn—also suffered from racial discrimination. *Id.* at 2318. The District Court explained that the 2013 legislature "had not purged its predecessor's discriminatory intent," and that the 2013 legislature had adopted the

court-drawn plans only as a "litigation strategy, designed to insulate the … 2013 plans from further challenge." *Id.*

The Supreme Court held that the District Court "erred when it required the State to show that the 2013 Legislature somehow purged the 'taint'" from the "defunct and never-used plans enacted by a prior legislature in 2013." *Id.* at 2325. The reason was simple: "[t]he 2013 Texas Legislature *did not reenact the plan previously passed* by its 2011 predecessor." *Id.* (emphasis added). Rather, the 2013 legislature "enacted, only with very small changes, plans that had been developed by the [District] Court." *Id.* As such, the Supreme Court explained that the case before it was "very different" than *Hunter*: *Hunter*, the *Abbott* Court explained, dealt with a law whose minor "amendments"—that is, the "prun[ing] of the list of disenfranchising offenses—"did not alter the intent with which the law was adopted." *Id.* In contrast, the *Abbott* Court considered a *new* enactment that "departed significantly" from the preceding discriminatory law. *Id.* at 2316.

Two recent Supreme Court cases confirm the principle that a recodification of a racially discriminatory law—without any attention to the law's racist origins—will not save it from invalidation. In *Ramos*, the Court struck down a state law permitting convictions by non-unanimous juries, citing the "racially discriminatory *reasons* that Louisiana and Oregon adopted their peculiar rules in the first place." 140 S. Ct. at 1401 (emphasis in original). Although Justice Alito argued in his dissent that both states later recodified their non-unanimity rules with no mention of race, the majority rejected the notion that the recodification cured the laws' original animus. *Id*. at 1401 n.44. (holding that when courts "assess the functional benefits" of a law, they cannot "ignore the very functions those rules were adopted to serve".) The majority thus declined to allow "shared respect for rational and civil discourse . . . supply an excuse for leaving an uncomfortable past unexamined." *Id.* (citation and quotations omitted).

Two months later, the Supreme Court struck down a Montana law prohibiting

20

families from using state-sponsored scholarships at religious schools. *See Espinoza v. Montana Dep't of Revenue,* 140 S. Ct. 2246 (2020). The majority relied on the law's "checkered tradition" of underlying religious discrimination, even though it was reenacted in the 1970s "for reasons unrelated to anti-Catholic bigotry." *Id.* at 2259. Concurring, Justice Alito invoked his *Ramos* dissent, noting its argument that courts cannot examine impermissible motives underlying the original version of a law where states have "readopted their rules under different circumstances in later years." *Id.* at 2268 (quotations omitted). Justice Alito—notably, the author of the *Abbott* majority—then stated, "But I lost, and *Ramos* is now precedent." *Id*. Justice Alito then provided an extensive history of the anti-Catholic and anti-immigrant motives underlying Montana's law, concluding that "[u]nder *Ramos*, it emphatically does not matter whether Montana readopted the no-aid provision for benign reasons. The provision's 'uncomfortable past' must still be 'examined.'" *Id*. at 2273 (quoting *Ramos*, 140 S. Ct., at 1396, n.44). The lesson of *Hunter*, *Abbott*, *Ramos,* and *Espinoza* is clear: recodification, readoption, or reenactment of a racially discriminatory law does not save it from Equal Protection scrutiny.

## 2. The 1952 Act, and all subsequent recodifications of the illegal-reentry law, were mere reenactments and not substantial changes

Here, the original illegal reentry law codified in the Undesirable Aliens Act of 1929 has been reenacted several times, most notably in the McCarran-Walter Act of 1952, which became the basis of Immigration and Nationality Act.[38] But in passing

---

[38] The 1952 enactment read: "Any alien who— (1) has been arrested and deported or excluded and deported, and thereafter (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior Act, shall be guilty of a felony, and upon conviction thereof, be punished by imprisonment of not more than two years, or by a fine of not more than $1,000, or both." June 27, 1952, c. 477, Title II, ch. 8, § 276, 66 Stat. 229.

21

the 1952 Act, Congress explicitly decided that "the present Act of March 4, 1929 should be reenacted" within the new Immigration and Nationality Act.  S. Rep. No. 81-1515, at 655 (1950), *reprinted in* Trelles, Oscar & James F. Bailey, *Immigration and Nationality Acts: Legislative Histories and Related Documents 1950-1978*; *attached as* Exhibit O. The Senate Report on the bill, which Congress later adopted, explicitly recommended that "[t]he provision relating to reentry after deportation should be carried forward[.]" *Id.* at 656. Interestingly, *Abbott* Court used just that phrase: explaining explain why it could not rely on the 2011 legislature's intent, the Court noted that the 2013 Legislature did not "use criteria that arguably *carried forward* the effects of any discriminatory intent on the part of the 2011 Legislature." *Abbott*, 138 S. Ct at 2325. Here, the 1952 Congress *explicitly* carried forward the 1929 law.

Substantively, the 1952 Act made minimal changes, which were designed to make the law easier to prosecute. The only substantive change was the addition of the "found-in" portion of § 1326, which allowed prosecutors to charge individuals who were apprehended in the interior of the Court. In a letter to Senate Judiciary Committee, Deputy Attorney General Peyton Ford explained that this change was necessary to make prosecution possible in cases where "it is not possible for the Immigration and Naturalization Service to establish the place of reentry, and hence the proper venue, arising in prosecutions against a deported alien under the 1929 act." *Joint Hearings Before the Subcommittees on the Judiciary on S. 716, H.R. 2379, and H.R. 2816 Bills to Revise the Laws Relating to Immigration, Naturalization, and Nationality*, 82nd Cong. 716 (1951) (statement of Deputy Attorney General Peyton Ford), attached as Exhibit P. That minor change did nothing to address the racist history of the law or its disparate impact; rather, it only made it easier to prosecute the offense. As such, this Court's focus must remain on the 1929 law.

**3.**      **In the alternative, the illegal reentry provision in the 1952 law**

**also satisfies the *Arlington Heights* test**

But even if this Court were to focus its attention on the 1952 Act, the *Arlington Heights* test still shows that racial prejudice was a motivating factor behind § 1326. For one, "the historical background" of the inclusion of § 1326 in the McCarran-Walter Act is the original 1929 Act. As argued above, the original 1929 Act was borne out of racial prejudice against Latinos. That factor, therefore, weighs strongly in Mr. Cruz-Ramos's favor. *See Arce*, 793 F.3d at 978. Further, as shown above, the disparate impact of § 1326 is uncontestably stark. *See supra* Section B.V. Finally, the events leading to the challenged action also supports a finding a racial bias. First, just a few months before Congress passed the McCarran-Walter Act, it passed the so-called "Wetback Bill." *See Carillo-Lopez*, \*23-24.The bill's stated aim was the same as that of § 1326: to "assist in preventing aliens from entering or remaining in the United States illegally." *See* United Statutes at Large, 82 Cong. ch. 108, 66 Stat. 26 (March 20, 1952); *see also* 98 Cong. Rec. 791 (1952), attached as Exhibit Q. According to some senators, the law was a necessary step to solve the "wetback problem." *See id.* See, e.g., id. at 793, 795 (statements of Hon. Dennis Chavez, Hon. Allen J. Ellender, Hon. Hubert Humphrey, Hon. Harley M. Kilgore). The use of this racial slur in the legislative history is probative of racial prejudice. *Machic-Xiap*, 2021 WL 3362738, at \*13 ("Again, 'wetback' is a racial epithet."); *Carillo-Lopez*, \*22 ("Common sense dictates, and many courts have acknowledged, that the term 'wetback' is racist."); *La Union del Pueblo Entero v. Ross*, 353 F. Supp. 3d 381, 395 (D. Md. 2018) ("And while the use of racial slurs, epithets, or other derogatory language does not alone prove discriminatory intent, it is evidence that official action may be motivated by such an unlawful purpose."). Although the "Wetback Bill" was passed a few months before the McCarran-Walter Act, the same racial slur can be found in the legislative history of the latter Act. Indeed, in the same statement urging the Senate to reenact the 1929 Act within the McCarran-Walter Act, albeit with

23

provisions to make venue easier to prove, Deputy Attorney General Ford used the slur "wetback." *See* Exh. P at 718 ("Statutory clarification on the above points will aid in taking action against the conveyors and receivers of the wetback.").

Finally, the racism inherent in the 1952 Act was apparent to observers at the time: President Truman vetoed the Act for that very reason, but Congress overrode his veto. *See* President Harry S. Truman, Veto of Bill to Revise the Law Relating to Immigration, Naturalization, and Nationality (June 25, 1952), attached as Exhibit R.[39] Although Truman did not specifically address § 1326, he noted that other portions of the Act "discriminate[], deliberately and intentionally, against many of the peoples of the world." *Id.* As the *Carillo-Lopez* Court noted:

> "[A]lthough President Truman did not address Section 1326 specifically, the veto statement presents in no uncertain terms a contemporary admonishment of an overly punitive and discriminatory immigration policy. Truman expressly drew the INA into dialogue with prior immigration legislation, from both 1924 and 1929, which were concededly racist. But the 1952 Congress rejected that call and overrode the veto."

*Carillo-Lopez*, *21.

In sum, these factors show that racial prejudice was also a "motivating factor" behind the 1952 passage of § 1326. Thus, even if this Court focuses on the 1952 Act, rather than the 1929 Act, Mr. Cruz-Ramos has met his burden.

**D.      The burden of proof shifts to the government**

Because Mr. Cruz-Ramos has shown both a discriminatory purpose and a disparate impact underlying § 1326, the burden shifts to the government to show that the Undesirable Aliens Act of 1929 would have passed "even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 266-68, 270 n.21; *see also Hunter*, 471 U.S. at 228 (shifting the burden to the law's defenders to "demonstrate that the law would have been enacted without this factor"). If, however,

---

[39] Available at https://www.trumanlibrary.gov/library/public-papers/182/veto-bill-revise-laws-relating-immigration-naturalization-and-nationality

the government submits evidence showing that the 1929 law would have been enacted without a discriminatory purpose (or if the Court believes that Mr. Cruz-Ramos has not yet shown a discriminatory purpose), the Court should schedule an evidentiary hearing. Courts frequently hold evidentiary hearings and trials to hear evidence on the *Arlington Heights* factors. *See e.g., Hunter*, 471 U.S. at 229 (relying on evidence at trial of state legislative proceedings, "several historical studies, and the testimony of two expert historians"); *Arce,* 793 F.3d at 991. Indeed, the Supreme Court has found error where a lower court granted summary judgment "without an evidentiary hearing" on a legislature's disputed motives under *Arlington Heights*. *Hunt v. Cromartie*, 526 U.S. 541, 545 (9th Cir. 1999).

At this evidentiary hearing, Mr. Cruz-Ramos intends to present testimony from expert witnesses, including Dr. Kelly Lytle Hernández, Professor of History at the UCLA and a MacArthur Genius Fellow, and Dr. Benjamin Gonzalez O'Brien, Associate Professor of Political Science at San Diego State University, who have each written about of the Undesirable Aliens Act of 1929. *See* Exhibit M, CV of Prof. Lytle Hernández; Exhibit N, CV of Prof. Gonzalez O'Brien. *See Hunter*, 471 U.S. at 228-29 (crediting the "testimony and opinions of historians" to determine a legislature's discriminatory intent under *Arlington Heights*).

### III. CONCLUSION

Mr. Cruz-Ramos respectfully requests that this Court join the *Carrillo-Lopez* Court, hold that 8 U.S.C. § 1326 violates Equal Protection, and dismiss the indictment.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  August 30, 2021          By  */s/ David Menninger*

DAVID MENNINGER
Attorneys for Fredy Stanley Cruz-Ramos

25

# EXHIBITS

1.   **Exhibit A** is an expert report prepared by Professor Kelly Lytle Hernández.

2.   **Exhibit B** is a copy of a House Report dated February 21, 1928.

3.   **Exhibit C** is a copy of the Congressional Record from February 16, 1929.

4.   **Exhibit D** is a copy of the Congressional Record from April 8, 1924.

5.   **Exhibit E** is a copy of the Congressional Record from February 9, 1928.

6.   **Exhibit F** is a copy of the Congressional Record from February 3, 1928.

7.   **Exhibit G** is a copy of a House Report dated January 12, 1926.

8.   **Exhibit H** is a copy of a Senate Report dated January 17, 1929.

9.   **Exhibit I** is a copy of the Congressional Record from January 23, 1929.

10.   **Exhibit J** is a copy of a House Report dated February 26, 1929.

11.   **Exhibit K** is a copy of the Congressional Record from February 15, 1929.

12.   **Exhibit L** is the Undesirable Aliens Act of 1929, which was signed into law on March 4, 1929.

13.   **Exhibit M** is a copy of Professor Hernández's CV.

14.   **Exhibit N** is a copy of Professor Benjamin Gonzalez O'Brien's CV.

15.   **Exhibit O** is a copy of a Senate Report dated March 29, 1950.

16.   **Exhibit P** is a copy of a Statement of Deputy Attorney General Peyton Ford, dated May 14, 1951.

17.   **Exhibit Q** is a copy of the excerpted Congressional Record from 1952.

18.   **Exhibit R** is a copy of President Truman's statement regarding his veto of the McCarran-Walter Act.

19.   **Exhibit S** is a copy of the District Court's decision in *United States v. Carrillo-Lopez*, CR 20-26-MMD (D. Nev. August 18, 2021).

1