TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
DAVID R. FRIEDMAN (Cal. Bar No. 300737)
Assistant United States Attorney
Criminal Appeals Section
    1000 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-7418
    Facsimile: (213) 894-8513
    E-mail:   David.Friedman@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 19-00189-JAK |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO MOTION TO DISMISS THE INDICTMENT UNDER THE EQUAL PROTECTION CLAUSE |
| v. | |
| FREDY STANLEY CRUZ RAMOS, aka "Fredy Stanley Cruz," | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney David R. Friedman, hereby files its Opposition to Defendant's Motion to Dismiss the Indictment Under the Equal Protection Clause. (Dkt. 75.)

//
//
//
//
//
//

1     This opposition is based upon the attached memorandum of points
2 and authorities, the files and records in this case, and such further
3 evidence and argument as the Court may permit.

4  Dated: September 13, 2021          Respectfully submitted,

5                                     TRACY L. WILKISON
                                      Acting United States Attorney
6
                                      SCOTT M. GARRINGER
7                                     Assistant United States Attorney
                                      Chief, Criminal Division
8

9                                     _____/s/_____
                                      DAVID R. FRIEDMAN
10                                    Assistant United States Attorney

11                                    Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

DESCRIPTION

I.  INTRODUCTION....................................................1

II. BACKGROUND......................................................2

    A.  Offense Conduct............................................2

    B.  History of Criminal Immigration Laws.......................3

III. ARGUMENT.......................................................5

    A.  Section 1326 Is Subject to Rational-Basis Review..........5

    B.  Section 1326 Satisfies Rational-Basis Review.............12

    C.  Even if Arlington Heights Applies, Defendant Has
        Failed to Show that § 1326 Was Enacted with
        Discriminatory Intent....................................13

        1.  Most of Defendant's Legislative History Concerns
            a Different Statute Passed by a Different
            Congress.............................................13

        2.  The INA Was Not Enacted with Discriminatory
            Intent..............................................18

        3.  Any Disparate Impact Is Explained By Geography......20

        4.  Subsequent Developments Have Removed Any "Taint"....22

    D.  Carrillo-Lopez Is Not Persuasive and Contrary to the
        Decisions of Every Other Court to Address This Claim.....24

    E.  This Court Should Not Hold an Evidentiary Hearing........25

IV. CONCLUSION.....................................................25

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                PAGE

**Cases**

Abbott v. Perez,
    138 S. Ct. 2305 (2018) ........................................ passim

Ablang v. Reno,
    52 F.3d 801 (9th Cir. 1995) ....................................... 7

Aleman v. Glickman,
    217 F.3d 1191 (9th Cir. 2000) .................................... 12

Bryan v. United States,
    524 U.S. 184 (1998) ............................................. 20

Cath. Soc. Servs. v. Reno,
    134 F.3d 921 (9th Cir. 1998) ...................................... 7

Circuit City Stores, Inc. v. Adams,
    532 U.S. 105 (2001) ............................................. 19

City of Mobile v. Bolden,
    446 U.S. 55 (1980) (plurality opinion) ........................... 14

Cotton v. Fordice,
    157 F.3d 388 (5th Cir. 1998) ..................................... 16

Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,
    140 S. Ct. 1891 (2020) ....................................... 11, 21

E. Bay Sanctuary Covenant v. Trump,
    932 F.3d 742 (9th Cir. 2018) ..................................... 18

Espinoza v. Mont. Dep't of Revenue,
    140 S. Ct. 2246 (2020) ....................................... 17, 18

Fiallo v. Bell,
    430 U.S. 787 (1977) ......................................... 6, 7, 11

Hayden v. Paterson,
    594 F.3d 150 (2d Cir. 2010) ...................................... 16

Heller v. Doe,
    509 U.S. 312 (1993) ............................................. 12

Hernandez-Mancilla v. Holder,
    633 F.3d 1182 (9th Cir. 2011) ..................................... 8

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

Hunter v. Underwood,
  471 U.S. 222 (1985) .......................................... 16, 17

Johnson v. Governor,
  405 F.3d 1214 (11th Cir. 2005) (en banc) ...................... 16

Kleindienst v. Mandel,
  408 U.S. 753 (1972) ............................................ 7

Ledezma-Cosino v. Sessions,
  857 F.3d 1042 (9th Cir. 2017) (en banc) ........................ 8

Menotti v. City of Seattle,
  409 F.3d 1113 (9th Cir. 2005) .................................. 6

Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.,
  463 U.S. 29 (1983) ............................................ 10

N.C. State Conf. of the NAACP v. Raymond,
  981 F.3d 295 (4th Cir. 2020) .................................. 16

Palmer v. Thompson,
  403 U.S. 217 (1971) ............................................ 6

Ramos v. Louisiana,
  140 S. Ct. 1390 (2020) ........................................ 17

Ramos v. Wolf,
  975 F.3d 872 (9th Cir. 2020) ............................. 9, 10, 11

Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.,
  908 F.3d 476 (9th Cir. 2018) ................................ 9, 10

Trump v. Hawaii,
  138 S. Ct. 2392 (2018) ...................................... 7, 12

Turner Broad. Sys. v. FCC,
  512 U.S. 622 (1994) ............................................ 6

United States v. Arenas-Ortiz,
  339 F.3d 1066 (9th Cir. 2003) ................................. 20

United States v. Armstrong,
  517 U.S. 456 (1996) ........................................... 20

United States v. Ayala-Bello,
  995 F.3d 710 (9th Cir. 2021) ............................... 1, 21

iii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                PAGE

United States v. Barron-Rivera,
  922 F.2d 549 (9th Cir. 1991) ....................................... 3

United States v. Carrillo-Lopez,
  --- F. Supp. 3d ----,
  2021 WL 3667330 (D. Nev. Aug. 18, 2021) ...................... 24, 25

United States v. Cupa-Guillen,
  34 F.3d 860 (9th Cir. 1994) ................................. 11, 12

United States v. Dumas,
  64 F.3d 1427 (9th Cir. 1995) ................................ 15, 21

United States v. Gutierrez-Barba,
  No. CR 19-01224-DJH,
  2021 WL 2138801 (D. Ariz. May 25, 2021) .................. 22, 23, 24

United States v. Hernandez-Guerrero,
  147 F.3d 1075 (9th Cir. 1998) ............................... passim

United States v. Irwin,
  612 F.2d 1182 (9th Cir. 1980) ................................... 25

United States v. Lazcano-Neria,
  No. MJ 20-4538-AHG,
  2020 WL 6363685 (S.D. Cal. Oct. 29, 2020) ...................... 24

United States v. Lopez-Flores,
  63 F.3d 1468 (9th Cir. 1995) ................................. 1, 8

United States v. Lucas-Hernandez,
  No. MJ 19-24522-LL,
  2020 WL 6161150 (S.D. Cal. Oct. 21, 2020) ...................... 24

United States v. Machic-Xiap,
  --- F. Supp. ----,
  2021 WL 3362738 (D. Or. Aug. 3, 2021) ......................... 24

United States v. Medina Zepeda,
  No. CR 20-00057-FMO,
  Dkt. 33 (C.D. Cal. Jan. 5, 2021) ................... 14, 18, 24, 25

United States v. Novondo-Ceballos,
  No. CR 21-383-RB,
  2021 WL 3570229 (D.N.M. Aug. 12, 2021) ........................ 24

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                 PAGE

United States v. O'Brien,
  391 U.S. 367 (1968) ......................................... 6, 25

United States v. Palacios-Arias,
  No. CR 20-00062,
  Dkt. 37 (E.D. Va. Oct. 13, 2020) ................................. 24

United States v. Price,
  361 U.S. 304 (1960) .......................................... 14

United States v. Rios-Montano,
  No. CR 19-2123-GPC,
  2020 WL 7226441 (S.D. Cal. Dec. 8, 2020) ..................... 23, 24

United States v. Ruiz-Chairez,
  493 F.3d 1089 (9th Cir. 2007) ............................. 8, 9, 12

United States v. Turner,
  104 F.3d 1180 (9th Cir. 1997) ................................. 21

United States v. Wence,
  No. CR 20-0027,
  2021 WL 2463567 (D.V.I. June 16, 2021) ......................... 24

United States v. X-Citement Video, Inc.,
  513 U.S. 64 (1994) ........................................... 14

Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,
  429 U.S. 252 (1977) ......................................... 5, 13

Waterkeeper All., Inc. v. U.S. EPA,
  399 F.3d 486 (2d Cir. 2005) ................................... 14

**Statutes and Guidelines**

8 U.S.C. § 1325............................................... 9, 24

8 U.S.C. § 1326...........................................passim

18 U.S.C. § 1203.................................................. 8

U.S.S.G. § 2L1.2............................................... 8, 9

**Acts of Congress**

Immigration Act of 1917,
  Pub. L. No. 64-301, 39 Stat. 874 ................................ 3

1

**TABLE OF AUTHORITIES (CONTINUED)**

2 <u>DESCRIPTION</u>                                                            <u>PAGE</u>

3 Act of Mar. 4, 1929,
    Pub. L. No. 70-1018, 45 Stat. 1551 ................................. 3
4

5 Immigration and Nationality Act,
    Pub. L. No. 82-414, 66 Stat. 163 (1952) .......................... 4

6
Immigration and Nationality Act of 1965,
7    Pub. L. No. 89-236, 79 Stat. 911 ................................. 22

8 Anti-Drug Abuse Act of 1988,
    Pub. L. No. 100-690, 102 Stat. 4181 .............................. 4
9

10 Immigration Act of 1990,
    Pub. L. No. 101-649 104 Stat. 4978 ............................... 4

11 Violent Crime Control and Law Enforcement Act of 1994,
    Pub. L. No. 103-322, Stat. 1796 .................................. 4
12

13 Antiterrorism and Effective Death Penalty Act of 1996,
    Pub. L. No. 104-132, 110 Stat. 1214 .............................. 4
14

15 Consolidated Appropriations Act of 1997,
    Pub. L. No. 104-208, 110 Stat. 3009 .............................. 4

16 **Legislative History**

17 S. Rep. No. 70-1456 (1929) ..................................... 3, 4

18 H.R. Rep. No. 82-1365 (1952) .................................... 18

19 136 Cong. Rec. 36,844 (1990) .................................... 23

20

21

22

23

24

25

26

27

28

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3    Defendant Fredy Stanley Cruz Ramos has been charged with one

4    count of illegal reentry.  In his latest motion to dismiss, he claims

5    that 8 U.S.C. § 1326 -- a statute enacted by Congress in 1952 and

6    applied in countless cases -- violates the Equal Protection Clause.

7    As explained below, this Court should deny defendant's motion for at

8    least two independent reasons:

9    <u>First</u>, § 1326 satisfies rational-basis review.  Congress has

10   "sweeping" and "plenary" control over immigration policy.  <u>See United</u>

11   <u>States v. Hernandez-Guerrero</u>, 147 F.3d 1075, 1076 (9th Cir. 1998).

12   Given this broad authority, challenges to criminal immigration laws

13   are, at most, subject to rational-basis review.  <u>See, e.g.</u>, <u>United</u>

14   <u>States v. Ayala-Bello</u>, 995 F.3d 710, 714-15 (9th Cir. 2021); <u>United</u>

15   <u>States v. Lopez-Flores</u>, 63 F.3d 1468, 1473-75 (9th Cir. 1995).  And

16   as the Ninth Circuit has recognized, § 1326 plainly satisfies this

17   low bar because it is "a necessary piece of the immigration-

18   regulation framework."  <u>Hernandez-Guerrero</u>, 147 F.3d at 1078.

19   <u>Second</u>, defendant has failed to offer evidence of discriminatory

20   intent.  Even if the <u>Arlington Heights</u> standard applies, statements

21   that individual members of a different Congress made in support of a

22   different statute provide little insight into why § 1326 was enacted

23   decades later.  To the contrary, the Supreme Court has rejected

24   defendant's theory that prior discriminatory intent can forever

25   "taint" a law.  <u>See Abbott v. Perez</u>, 138 S. Ct. 2305, 2324-25 (2018).

26   Ultimately, what matters is why Congress passed § 1326, and the

27   legislative history of that statute contains no evidence of racial

28   animus.  Accordingly, defendant's motion should be denied.

**II.   BACKGROUND**

   **A.   Offense Conduct**

Defendant is a citizen and national of El Salvador.  (Dkt. 67 at 5.)  He has never had any legal status in the United States; none of his family members are U.S. citizens or lawful permanent residents; and only one family member, his father, lives in this country.  (Id. at 10.)  Defendant first entered the United States without inspection in 2003.  (Id. at 1.)  By 2008, defendant had joined the "Rebels" street gang in Hollywood, California.  (Id. at 12.)  Defendant rose up the ranks very quickly, as he would tell immigration authorities later that year that he was the "leader" of this gang.  (Id.)

Within just a few months of joining the Rebels, defendant was convicted of a felony count of possession of a deadly weapon, in violation of California Penal Code section 12020(a)(1).  (Id. at 2.)  Defendant further admitted, pursuant to California Penal Code section 186.22, that this offense "was committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members."  (Id.)  Defendant was sentenced to 180 days in county jail.  (Id.)  After serving this sentence, defendant was removed from the United States in September 2008.  (Id. at 2-6.)

Defendant then reentered without inspection.  In September 2018, he was arrested for DUI in Los Angeles.  (Id. at 6.)  Defendant pled guilty and was sentenced to several days in jail.  (Id.)  After this latest conviction, defendant was indicted for one count of illegal reentry, in violation of 8 U.S.C. §§ 1326(a), (b)(1).  (Dkt. 5.)  Defendant now challenges § 1326 as unconstitutional under the Equal Protection Clause.  (Dkt. 75 ("Mot.").)

**B.    History of Criminal Immigration Laws**

The Ninth Circuit has explained that "8 U.S.C. § 1326 is designed to effectively enforce the immigration laws." United States v. Barron-Rivera, 922 F.2d 549, 555 (9th Cir. 1991).  "By threatening with criminal prosecution any alien found in the United States who has previously been 'excluded, deported, or removed,' Congress sought in § 1326 to give teeth to civil immigration statutes and to ensure compliance with civil deportation orders." Hernandez-Guerrero, 147 F.3d at 1078.  This "immigration-regulation purpose" is clear from a review of the statute's background.  See id.

In the Immigration Act of 1917, Congress passed legislation requiring deportation of aliens who entered the United States "at any time or place other than as designated by immigration officials, . . . or who enter[ed] without inspection."  Pub. L. No. 64-301, § 19, 39 Stat. 874, 889.  However, there was no penalty, other than repeated deportation, for reentering after deportation.  To enhance the deterrent value of the deportation laws, the 70th Congress made reentry after deportation a felony offense punishable by up to two years' imprisonment.  See Act of Mar. 4, 1929, Pub. L. No. 70-1018, 45 Stat. 1551.  The Senate Report from the Committee on Immigration explained that "there is no provision of law under which a penalty, other than repeated deportation, can be imposed on aliens who have been expelled from the United States and who reenter the country unlawfully.  It frequently happens that aliens of the criminal and other classes who are deported under the general immigration law reenter the country unlawfully." S. Rep. No. 70-1456, at 1 (1929).  Indeed, "in some instances such aliens have been deported four or five times, only to return as soon as possible to the United States

in an unlawful manner." Id. Thus, Congress determined that a statute prohibiting illegal reentry "would be of material aid in enforcing our immigration laws." Id.

Over twenty years later, in 1952, the 82nd Congress passed the Immigration and Nationality Act ("INA"), a comprehensive act designed to "revise the laws relating to immigration, naturalization, and nationality" in the United States. See Pub. L. No. 82-414, 66 Stat. 163 (1952). In this comprehensive legislation, Congress created a new offense prohibiting the reentry of a deported alien -- 8 U.S.C. § 1326. Id. § 276, 66 Stat. at 229.

Over the years, Congress has updated § 1326 multiple times. In the Anti-Drug Abuse Act of 1988, for example, the 100th Congress added subsection (b), creating enhanced penalties for aliens with prior felony convictions. See Pub. L. No. 100-690, § 7345, 102 Stat. 4181, 4471. Congress also adopted additional modifications in the Immigration Act of 1990, Pub. L. No. 101-649, § 543, 104 Stat. 4978, 5059 (increasing the fine provision); the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 130001, 108 Stat. 1796, 2023 (increasing penalties); the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 441, 110 Stat. 1214, 1279 (adding subsection (d)); and the Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, § 308, 110 Stat. 3009, 3009-618 (replacing several references to "deported" and "excluded" with updated terms).

Up until last month, no court had ever suggested that any version of this statute violated the Equal Protection Clause. To the contrary, the Ninth Circuit has recognized that "§ 1326 is a necessary piece of the immigration-regulation framework," Hernandez-

4

*Guerrero*, 147 F.3d at 1078, and numerous district courts have rejected the very motion defendant is now making, see infra Section III.D.  As explained below, that consensus view is correct: § 1326 is a facially neutral statute that serves the valuable purpose of deterring illegal reentry and does not violate the Equal Protection Clause.

**III. ARGUMENT**

This Court should deny defendant's motion to dismiss the indictment.  The Ninth Circuit has repeatedly held that criminal immigration laws are subject to rational-basis review.  Section 1326 clearly satisfies this standard because it is a necessary piece of the immigration-regulation framework.  And even if the *Arlington Heights* standard applies, defendant has not met his burden of demonstrating that § 1326 was enacted with discriminatory intent.  Indeed, he has not even shown that it has a discriminatory effect.  Accordingly, this Court should join the many other district courts that have rejected defendant's claim.

**A.   Section 1326 Is Subject to Rational-Basis Review**

Defendant's motion is predicated on the premise that an equal protection challenge to § 1326 should be evaluated under the multi-factor test set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).  In *Arlington Heights* -- a civil case unrelated to immigration -- a real estate developer challenged a zoning board's refusal to grant a rezoning request that would have accommodated low-income housing.  *Id.* at 254.

Defendant has failed to identify any circuit-level cases where the *Arlington Heights* test was used to review a law passed by Congress.  And with good reason.  The Supreme Court has long held

5

that it "will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." United States v. O'Brien, 391 U.S. 367, 383 (1968); see also Menotti v. City of Seattle, 409 F.3d 1113, 1130 n.29 (9th Cir. 2005) ("The Supreme Court has held unequivocally that it 'will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.'" (quoting O'Brien, 391 U.S. at 383)).  What's more, the Court has also warned against trying to determine the "motive" or "purpose" of a law based on the scattered legislative speeches of a few members of Congress.  As it has explained, "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork." O'Brien, 391 U.S. at 384.  Therefore, courts should not void a law "which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it." Id.; see Turner Broad. Sys. v. FCC, 512 U.S. 622, 652 (1994); Palmer v. Thompson, 403 U.S. 217, 224 (1971) ("[N]o case in this Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it.").

Yet that is precisely what defendant asks this Court to do.  His request is doubly inappropriate because "in cases of this sort" -- that is, involving immigration policy -- "it is not the judicial role . . . to probe and test the justifications for the legislative decision." Fiallo v. Bell, 430 U.S. 787, 799 (1977).  Indeed, for more than a century, "it has been universally acknowledged that Congress possesses authority over immigration policy as an incident of sovereignty." Hernandez-Guerrero, 147 F.3d at 1076 (quotation

6

marks omitted).  The Supreme Court has called Congress's inherent immigration power "plenary"; the Ninth Circuit has deemed it "sweeping."  Id. (quoting Kleindienst v. Mandel, 408 U.S. 753, 765 (1972); and Cath. Soc. Servs. v. Reno, 134 F.3d 921, 927 (9th Cir. 1998)).  "Whatever the label, all agree that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens."  Id. (quoting Fiallo, 430 U.S. at 792).  Given Congress's expansive authority, there is a "limited scope of judicial inquiry into immigration legislation."  Fiallo, 430 U.S. at 792; see also Trump v. Hawaii, 138 S. Ct. 2392, 2419 (2018) ("deferential standard of review" applies in immigration cases).  In this unique context, courts may review only whether such laws are "facially legitimate and bona fide."  Mandel, 408 U.S. at 769.

This deferential standard is "equivalent to the rational basis test."  Ablang v. Reno, 52 F.3d 801, 804 (9th Cir. 1995).  And the Supreme Court has squarely held that it applies to equal protection challenges.  In Fiallo v. Bell, the Court reviewed an equal protection challenge to a law that gave immigration preferences to mothers, but not fathers, of illegitimate children.  430 U.S. at 788-90.  Despite the nature of the claim, the Supreme Court found "no reason to review the broad congressional policy choice at issue . . . under a more exacting standard."  Id. at 795.  The Court also emphasized that it was "not the judicial role in [immigration cases] to probe and test the justifications for the legislative decision."  Id. at 799; see also Hawaii, 138 S. Ct. at 2419 (same).  Consistent with Fiallo, the Ninth Circuit has routinely applied rational-basis review to equal protection claims raised in the immigration context.  See, e.g., Hernandez-Mancilla v. Holder, 633 F.3d 1182, 1185 (9th

1 Cir. 2011) ("We review equal protection challenges to federal

2 immigration laws under the rational basis standard[.]"); Ledezma-

3 Cosino v. Sessions, 857 F.3d 1042, 1049 (9th Cir. 2017) (en banc)

4 (same); see also id. at 1050 (Kozinski, J., concurring) (arguing that

5 "the government's burden is even lighter than rational basis: We

6 approve immigration laws that are facially legitimate without probing

7 or testing possible justifications").

8      Moreover, the Ninth Circuit has repeatedly held that challenges

9 to criminal immigration statutes such as § 1326, which apply to

10 immigrants generally without regard to country of origin, are subject

11 to rational-basis review.  In United States v. Lopez-Flores, for

12 example, the court addressed an equal protection challenge to 18

13 U.S.C. § 1203, which "classifies offenders on the basis of the

14 offender's and the victim's nationality."  63 F.3d at 1471.  The

15 defendants argued that this statute violates the Equal Protection

16 Clause because "it arbitrarily classifies offenders and victims on

17 the basis of alienage."  Id. at 1472.  But consistent with Supreme

18 Court precedent, the Ninth Circuit rejected this claim because

19 "[f]ederal legislation that classifies on the basis of alienage [is]

20 subject to the lowest level of judicial review."  Id. at 1475.

21      In United States v. Ruiz-Chairez, 493 F.3d 1089 (9th Cir. 2007),

22 the Ninth Circuit considered a similar equal protection challenge to

23 U.S.S.G. § 2L1.2 -- the sentencing guideline that "effectuates the

24 illegal reentry statute" and determines the offense level for § 1326

25 convictions.  Id. at 1091.  Again, the court applied rational-basis

26 review.  Id.  And "[b]ecause the illegal reentry statute is a proper

27 exercise of Congress's immigration power, and because § 2L1.2

28 properly implements this congressional directive," the court

1  concluded that "§ 2L1.2 serves a legitimate government interest and
2  has a rational basis." Id. at 1091 (citations omitted).

3      Indeed, the Ninth Circuit recently applied these same principles
4  to 8 U.S.C. § 1325, which punishes the related crime of illegal
5  entry. In United States v. Ayala-Bello, the defendants were charged
6  with "first-time illegal entry," which is a petty offense, but were
7  still prosecuted on the normal criminal docket -- as opposed to
8  through the CVB process. 995 F.3d at 713-14. They argued that the
9  government's policy of prosecuting illegal entry (but not other petty
10 offenses) on the normal criminal docket violated their right to equal
11 protection. Id. The court, however, squarely rejected their claim
12 that "heightened scrutiny" applied because the policy discriminates
13 against noncitizens. Id. at 714-15. Rather, the Ninth Circuit would
14 review "the government's policy, at most, under the rational basis
15 test" because "[f]ederal classifications based on alienage receive
16 rational basis review." Id. at 715. And the policy satisfied this
17 standard because "the federal government has a legitimate interest in
18 controlling our borders." Id.

19     The reasoning of the foregoing cases fully applies here, and
20 defendant provides no basis for disregarding them. Moreover, the two
21 cases that defendant cites for the proposition that § 1326 should be
22 evaluated under the Arlington Heights standard (Mot. at 4) -- Ramos
23 v. Wolf, 975 F.3d 872 (9th Cir. 2020) and Regents of the University
24 of California v. United States Department of Homeland Security, 908
25 F.3d 476 (9th Cir. 2018) -- do not support his position. Neither
26 case even intimates that the Ninth Circuit intended to undermine its
27 consistent case law establishing that the INA itself is proper
28 exercise of Congress's immigration power and its provisions are

9

subject to rational-basis review.  And at issue in both cases was agency action, which is generally not accorded the same deference as statutes enacted by Congress.  See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 n.9 (1983) ("We do not view as equivalent the presumption of constitutionality afforded legislation drafted by Congress and the presumption of regularity afforded an agency in fulfilling its statutory mandate.").  The facts of these cases are thus readily distinguishable.

In Regents, the Ninth Circuit reviewed a challenge to an agency decision, made by the Department of Homeland Security ("DHS"), to eliminate the Deferred Action for Childhood Arrivals program ("DACA").  908 F.3d at 486.  DACA "allows those noncitizens who unwittingly entered the United States as children, who have clean criminal records, and who meet various educational or military service requirements to apply for two-year renewable periods of deferred action."  Id.  The Ninth Circuit's decision to apply the Arlington Heights standard was based upon several unique features of the case, "including the physical location of the plaintiffs within the geographic United States, the lack of a national security justification for the challenged government action, and the nature of the constitutional claim raised."  Id. at 520 (citation omitted).

Ramos involved an equal protection challenge to the DHS's recission of Temporary Protected Status ("TPS") designation for certain countries.  975 F.3d at 883.  TPS protects noncitizens who are lawfully present in the United States and cannot safely return to their home country.  Id. at 879.  Notably, the agency's recission of TPS was not facially neutral -- it was directed at specific countries.  Id. at 880-83.  The Ninth Circuit again applied the

10

*Arlington Heights* standard because it was reviewing the actions of "an agency in its administration of a humanitarian relief program established by Congress for foreign nationals who have lawfully resided in the United States for some time."  *Id.* at 896.

Here, defendant is not challenging an agency's debatable administration of a program established by Congress; he is challenging the statute itself.  Nor is he challenging government action with respect with to (a) individuals unwittingly brought here as children, who have clean criminal records, as in *Regents* or (b) immigrants here lawfully, as in *Ramos*.  Rather, he is challenging a statute specifically directed at individuals who have already been removed once and who have flouted U.S. law by returning illegally -- people with no right to be in the United States and whose actions threaten the security of the border.  As the Ninth Circuit has recognized, illegal reentry is a crime precisely because "there is a strong societal interest in controlling immigration and in effectively policing our borders."  *United States v. Cupa-Guillen*, 34 F.3d 860, 863 (9th Cir. 1994).  This strong interest distinguishes the present case from *Regents* and *Ramos* and calls for a more deferential standard of review.[1]

Ultimately, the Supreme Court has squarely held that equal protection challenges to congressional immigration laws are subject to rational-basis review.  *See Fiallo*, 430 U.S. at 795.  Whatever exception was created by *Ramos* and *Regents*, it does not apply to

---

[1]  Defendant also claims that "at least five members of the Supreme Court agreed that *Arlington Heights* applied" in *Regents*. (Mot. at 4.)  The majority, however, expressly declined to "resolve this debate" over the standard of review because the plaintiffs' allegations failed regardless.  140 S. Ct. 1891, 1915 (2020).

1   § 1326.  Rather, this Court should follow the controlling precedent
2   of Ayala-Bello, Lopez-Flores, and Ruiz-Chairez.

3   **B.   Section 1326 Satisfies Rational-Basis Review**

4        The rational-basis test is an "exceedingly low level of judicial
5   scrutiny."  Aleman v. Glickman, 217 F.3d 1191, 1201 (9th Cir. 2000).
6   The test is met where "there is a rational relationship between the
7   disparity of treatment and some legitimate governmental purpose."
8   Heller v. Doe, 509 U.S. 312, 320 (1993).  "[T]he government 'has no
9   obligation to produce evidence to sustain the rationality of a
10  statutory classification'; '[t]he burden is on the one attacking the
11  legislative arrangement to negative every conceivable basis which
12  might support it.'"  Glickman, 217 F.3d at 1201 (alteration in
13  original) (quoting Heller, 509 U.S. at 320).  Therefore, "it should
14  come as no surprise that the Court hardly ever strikes down a policy
15  as illegitimate under rational basis scrutiny."  Hawaii, 138 S. Ct.
16  at 2420.

17       Section 1326 easily clears this bar.  The government has a
18  legitimate interest in "controlling immigration and in effectively
19  policing our borders."  Cupa-Guillen, 34 F.3d at 863.  And there is a
20  clear relationship between that interest and § 1326.  "In fact, it is
21  plain that § 1326 is a necessary piece of the immigration-regulation
22  framework; without the threat of criminal prosecution that it
23  provides, Congress's immigration-regulation authority would be
24  fatally undermined -- all bark and no bite."  Hernandez-Guerrero, 147
25  F.3d at 1078; see also Ruiz-Chairez, 493 F.3d at 1091-92 (concluding
26  that "the 16 level enhancement for illegal reentrants who have
27  committed drug related and violent crimes has a rational basis").
28  Accordingly, 8 U.S.C. § 1326 has a rational basis.

12

### C. Even if <u>Arlington Heights</u> Applies, Defendant Has Failed to Show that § 1326 Was Enacted with Discriminatory Intent

In <u>Arlington Heights</u>, the Supreme Court reviewed an equal protection challenge to a zoning board's refusal to grant a rezoning request that would have accommodated low-income housing. 429 U.S. at 254. The Court explained that the plaintiffs had the "burden of proving that discriminatory purpose was a motivating factor in the [the board's] decision." <u>Id.</u> at 270. In analyzing that issue, the Court considered both "circumstantial and direct evidence of intent," including the "impact of the official action" on protected classes, the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," and the "legislative or administrative history." <u>Id.</u> at 266-68. Even if § 1326 is subjected to that analysis, defendant has not established that the statute was enacted with discriminatory intent.

### 1. Most of Defendant's Legislative History Concerns a Different Statute Passed by a Different Congress

The majority of defendant's motion is devoted to arguing that the legislative history of the illegal reentry statute passed in 1929 (the "1929 Act") establishes that it was motivated by racial animus. (Mot. at 4-17.) The government does not dispute that several Congressmen made discriminatory, racist, and offensive comments in support of this legislation. Nor does the government dispute that eugenics and other pseudo-scientific theories that may have held some sway in the 1920s no longer have any place in a civilized society. But the evidence of discriminatory intent cataloged by defendant relates to a different law passed by a different Congress at a different time. Therefore, it has minimal, if any, relevance to the question of whether 8 U.S.C. § 1326 was motivated by racial animus.

13

As explained by Judge Olguin in rejecting an identical claim, there is "no authority or basis for the court to evaluate the 1952 statute solely on the basis of the legislative history relating to the Undesirable Aliens Act of 1929." United States v. Medina Zepeda, No. CR 20-00057-FMO, Dkt. 33 at 5 (C.D. Cal. Jan. 5, 2021).  On the contrary, the Supreme Court has rejected this type of reasoning.  As a general matter, the views of one Congress are not "of great weight" in determining the meaning of a law passed by a different Congress. United States v. X-Citement Video, Inc., 513 U.S. 64, 77 n.6 (1994). And the views of just a few members of a different Congress "are of even less weight."  Id.  Thus, the type of legislative history relied upon by defendant -- expressing the views of a few members of a different Congress about a law they did not pass -- "form[s] a hazardous basis for inferring" congressional intent.  United States v. Price, 361 U.S. 304, 313 (1960); see also Waterkeeper All., Inc. v. U.S. EPA, 399 F.3d 486, 508 (2d Cir. 2005) ("Prior legislative history is a hazardous basis for inferring the intent of a subsequent Congress . . . .").

Based on these commonsense principles, the Supreme Court has held that "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." Abbott, 138 S. Ct. at 2324 (alteration omitted) (quoting City of Mobile v. Bolden, 446 U.S. 55, 74 (1980) (plurality opinion)).  Nor is legislative intent an artifact that carries over from one law to the next.  See City of Mobile, 446 U.S. at 74 (explaining that "[m]ore distant instances of official discrimination in other cases are of limited help in resolving" whether discriminatory intent has been proved in a given case).  Rather, each legislature is entitled to a

14

1  presumption of good faith, and this presumption is "not changed by a
2  finding of past discrimination." Abbott, 138 S. Ct. at 2324.

3      The Supreme Court's decision in Abbott v. Perez is particularly
4  instructive on this point.  In Abbott, the plaintiffs raised an equal
5  protection challenge to a redistricting plan enacted by the 2013
6  Texas Legislature.  138 S. Ct. at 2318.  However, the focus of their
7  claim was the actions of a different legislature; the plaintiffs
8  argued that the 2011 Legislature had harbored a discriminatory intent
9  in passing an earlier plan and this "discriminatory taint" had
10 carried over to the 2013 Legislature.  Id.  The Supreme Court flatly
11 rejected this theory.  Id. at 2324-26.  As the Court explained,
12 "there can be no doubt about what matters: It is the intent of the
13 2013 Legislature."  Id. at 2325.

14     Similarly, in United States v. Dumas, the Ninth Circuit rejected
15 attempts to ascribe the racism underlying one Congress's decision to
16 criminalize cocaine in 1914 to a different Congress's decision to
17 distinguish between crack and cocaine decades later.  64 F.3d 1427,
18 1430 (9th Cir. 1995).  In that case, "Dumas point[ed] to the racism
19 which permeated the legislative debates leading to enactment of the
20 Harrison Act of 1914, the first federal law to criminalize cocaine"
21 as support for his equal protection claim.  Id.  But the Ninth
22 Circuit correctly concluded that this evidence was irrelevant because
23 "changes which occurred in American society between 1914 and 1986
24 . . . make it anomalous to ascribe to the 1986 Congress the racism of
25 the Congress of 1914."  Id. (quotation marks omitted).

26     Other Circuits have also concluded that a prior finding of
27 discriminatory intent does not taint a law passed by a subsequent
28 legislature.  See, e.g., N.C. State Conf. of the NAACP v. Raymond,

981 F.3d 295, 303-05 (4th Cir. 2020); <u>Hayden v. Paterson</u>, 594 F.3d 150, 166-67 (2d Cir. 2010); <u>Johnson v. Governor</u>, 405 F.3d 1214, 1223-24 (11th Cir. 2005) (en banc); <u>Cotton v. Fordice</u>, 157 F.3d 388, 391-92 & n.7 (5th Cir. 1998).  Those courts have rejected defendant's argument that prior intent "remains legally operative" unless and until some affirmative contrary showing is made.  <u>Johnson</u>, 405 F.3d at 1223; <u>see Hayden</u>, 594 F.3d at 166-67.  Instead, challengers must show the "current version" of the law was "adopted out of a desire to discriminate."  <u>Cotton</u>, 157 F.3d at 392.

Contrary to defendant's claim, <u>Hunter v. Underwood</u>, 471 U.S. 222 (1985) does not conflict with this consistent precedent.  (Mot. at 19.)  In <u>Hunter</u>, the Supreme Court addressed an equal protection challenge to an article of the Alabama Constitution adopted in 1901 that disenfranchised anyone convicted of a long list of crimes.  471 U.S. at 226-27.  The state did not dispute that this article was adopted for discriminatory reasons.  <u>Id.</u> at 228-30.  But the state argued that it was constitutional because "[s]ome of the more blatantly discriminatory" parts of the article had been struck down "in the succeeding 80 years."  <u>Id.</u> at 232-33.  The Supreme Court rejected this argument because the enactment of the remaining provisions was still "motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect."  <u>Id.</u> at 233.

As explained in <u>Abbott</u>, this reasoning does not apply here because the 1929 Act is no longer in force.  <u>See</u> 138 S. Ct. at 2325.  In <u>Hunter</u>, the Supreme Court was reviewing provisions of the original 1901 article that had never been recodified or repealed -- and which were indisputably motivated by discriminatory intent.  471 U.S. at

233.  By contrast, this Court is reviewing a different law that was passed by a different Congress.  Indeed, as highlighted in Abbott, 138 S. Ct. at 2325, Hunter specifically declined to address the question of whether the article would have been valid if "enacted today," 471 U.S. at 233.  That is the relevant question here.

Defendant's reliance on Ramos v. Louisiana, 140 S. Ct. 1390 (2020) and Espinoza v. Montana Department of Revenue, 140 S. Ct. 2246 (2020) is similarly misplaced.  (Mot. at 20-21.)  Neither case supports his broad claim that prior discrimination can forever taint a law passed by a subsequent legislature.

In Ramos, the Supreme Court held that the Sixth Amendment right to a jury trial "requires a unanimous verdict to convict a defendant of a serious offense."  140 S. Ct. at 1394.  That result flowed from a historical and textual analysis of the Sixth Amendment.  See id. at 1399-1402.  The Court also highlighted that nonunanimous juries were adopted for "racially discriminatory reasons."  Id. at 1401 (emphasis omitted).  The majority, however, explicitly noted that this historical background was not the basis of its decision; rather, it agreed that "the dissent is right about one thing -- a jurisdiction adopting a nonunanimous jury rule even for benign reasons would still violate the Sixth Amendment."  Id. at 1401 n.44.

The Supreme Court employed the same analysis in Espinoza.  In that case, the Court considered whether application of a "no-aid" provision to bar religious schools from participating in a state scholarship program violated the First Amendment.  140 S. Ct. at 2254.  The answer was yes, because the provision "plainly exclude[d] schools from government aid solely because of religious status."  Id. at 2255.  Similarly to Ramos, the Court noted that no-aid provisions

17

1   had a "checkered tradition," which included discrimination against

2   Catholics.  Id. at 2259.  Yet the majority again explicitly noted

3   that this history did not "inform [its] understanding of the Free

4   Exercise Clause."  Id.  Thus, neither Espinoza nor Ramos supports

5   "defendant's contention that § 1326 should be judged according to

6   legislative history from laws enacted decades earlier, and that

7   'later reenactments do not cleanse the law of its original taint.'"

8   Medina Zepeda, No. CR 20-00057-FMO, Dkt. 33 at 5.[2]

9           2.   The INA Was Not Enacted with Discriminatory Intent

10      The question before this Court is whether 8 U.S.C. § 1326 --

11  first passed in 1952 as part of the INA and reenacted several times

12  since then -- was enacted with discriminatory intent.  The history of

13  this statute plainly demonstrates that it was not.

14      As a threshold matter, defendant is wrong that § 1326 was a

15  "mere reenactment" of the 1929 Act.  (Mot. at 21-22.)  Section 1326

16  was enacted as part of the INA in 1952.  Congress's purpose in

17  passing the INA was "to enact a comprehensive, revised immigration,

18  naturalization, and nationality code."  H.R. Rep. No. 82-1365, at 5

19  (1952).  It "replaced" the "disparate statutory scheme" that

20  previously regulated immigration law and remains the "governing

21  statutory framework" in this field.  E. Bay Sanctuary Covenant v.

22  Trump, 932 F.3d 742, 756 (9th Cir. 2018).  The INA thus represented a

23  major sea change in immigration law, not some mere reenactment.  And

24  beyond this broader context, the INA made at least one major change

25

26  _____

27          [2]  Defendant also relies upon a series of decisions that are
    primarily from the nineteenth century to argue that a recodification
    is sometimes a "continuation of the original statute."  (Mot. at 18.)

28  None of these cases have anything to do with the Equal Protection
    Clause or the type of challenge at issue here.

to § 1326.  As noted by defendant, the new version of illegal reentry included the "found-in" provision, which expanded its scope to noncitizens found in the interior of the country.  (Mot. at 22.)

There is nothing in the legislative history of § 1326 or the INA that demonstrates it was motivated by discriminatory intent.  By 1952, all the proponents of the 1929 Act mentioned in defendant's motion were either dead (Harry Laughlin, Coleman Blease, James Davis, John Box, Martin Madden, William Lankford, and Harry Hull) or out of Congress (Albert Johnson, Patrick O'Sullivan, Robert Green, John Schafer, Roy Fitzgerald, and Thomas Blanton).  And defendant points to no similar statements in the legislative history of § 1326.  Instead, defendant relies upon statements regarding other laws and the views of individuals outside of Congress.  (Mot. at 23-24.)

None of this evidence is relevant.  Defendant first argues that § 1326 was motivated by racial animus because the same Congress also passed a different law that some Senators referred to as the "Wetback Bill."  (Mot. at 23.)  There is no doubt that the term "wetback" is an offensive racial epithet.  But the use of this slur in the legislative history of a different bill (by just a handful of Congressmen) does not shed any meaningful light on the purpose motivating § 1326.  Similarly, defendant notes that Deputy Attorney General Peyton Ford wrote a letter supporting the passage of § 1326 that used this same epithet.  (Mot. at 23-24.)  However, Ford was not a member of Congress -- and did not vote on § 1326 -- so his views carry no weight.  See Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 120 (2001) ("Legislative history is problematic even when the attempt is to draw inferences from the intent of duly appointed committees of the Congress.  It becomes far more so when we consult

1  sources still more steps removed from the full Congress[.]").

2  Finally, defendant relies upon President Truman's statement in

3  support of his veto of the INA, which Congress overrode.  (Mot. at

4  24.)  Defendant highlights President Truman's comment that the INA's

5  "quota system . . . discriminates, deliberately and intentionally,

6  against many of the peoples of the world."  (Id.)  Yet as defendant

7  himself recognizes, President Truman made no references to § 1326 in

8  this statement.  (Id.)  And in any event, "the fears and doubts of

9  the opposition are no authoritative guide to the construction of

10  legislation."  Bryan v. United States, 524 U.S. 184, 196 (1998)

11  (cleaned up).

12              3.  Any Disparate Impact Is Explained By Geography

13  Apart from legislative history, defendant also argues that

14  § 1326 was enacted with discriminatory intent because it has a

15  disparate impact on Latino defendants.  (Mot. at 16.)  According to

16  defendant, "in 2019, fully 99% of people prosecuted for illegal

17  reentry were Latino."  (Id.)  But even if true, any disparate impact

18  is explained by geography, not race.  As the Ninth Circuit noted in

19  responding to a similar claim of selective prosecution, "common sense

20  suggests that it would be substantially more difficult for an alien

21  removed to China to return to the United States than for an alien

22  removed to Mexico to do so."  United States v. Arenas-Ortiz, 339 F.3d

23  1066, 1070 (9th Cir. 2003); see also United States v. Armstrong, 517

24  U.S. 456, 465 (1996) ("The requirements for a selective-prosecution

25  claim draw on ordinary equal protection standards." (quotation marks

26  omitted)).  Therefore, it is hardly surprising that so many people

27  prosecuted for illegal reentry are Latino.

28

1    Moreover, the Supreme Court has confronted -- and rejected -- an
2    argument virtually identical to defendant's.  See Dep't of Homeland
3    Sec. v. Regents of the Univ. of Cal., 140 S. Ct. at 1915.  When
4    Regents reached the Supreme Court, the plaintiffs argued that the
5    recission of DACA was motivated by racial animus because, among other
6    reasons, most DACA recipients are Latino.  Id.  The Court, however,
7    rejected that claim "because Latinos make up a large share of the
8    unauthorized alien population, [so] one would expect them to make up
9    an outsized share of recipients of any cross-cutting immigration
10   relief program."  Id.  Indeed, "[w]ere this fact sufficient to state
11   a claim, virtually any generally applicable immigration policy could
12   be challenged on equal protection grounds."  Id. at 1916.

13   Regardless, disparate impact alone is not sufficient to
14   establish discriminatory intent.  In Dumas, for example, the
15   defendant offered "statistics showing that Blacks comprise only 12%
16   of the nation's total population, but are involved in 92% of all
17   federal crack prosecutions."  64 F.3d at 1429.  But absent evidence
18   of discriminatory intent, the Ninth Circuit concluded that this
19   evidence alone was "insufficient to support a finding of invidious
20   racial discrimination in a facially neutral law."  Id.; see also
21   United States v. Turner, 104 F.3d 1180, 1184-85 (9th Cir. 1997)
22   (denying selective prosecution claim on same grounds).  Similarly, in
23   Ayala-Bello, the defendants argued that the government's policy was
24   discriminatory because it had a disparate impact.  995 F.3d at 714.
25   The Ninth Circuit, however, explained that "[a]t best, the
26   government's policy has a disparate impact on aliens, since only
27   aliens can be charged with illegal entry.  But disparate impact does
28   not prove disparate treatment."  Id.  The same is true here.

4.   <u>Subsequent Developments Have Removed Any "Taint"</u>

In the end, defendant has failed to offer any persuasive evidence that § 1326 was enacted with discriminatory intent.  Rather, he relies upon statements that were made by proponents of different bills, members of different Congresses, and individuals outside of Congress.  Even if these statement have some limited relevance, this type of indirect and unconvincing evidence is not enough to satisfy defendant's heavy burden.  <u>See Abbott</u>, 138 S. Ct. at 2327-30 (concluding that similar evidence was "plainly insufficient").

Furthermore, defendant ignores that § 1326 and the INA have not remained static since 1952.  Section 1326 has been modified and reenacted multiple times, including in 1988, 1990, 1994, and 1996 (on two occasions).  So, too, has the INA.  Even if defendant's flawed legal theory is correct -- which it is not -- two significant developments have cleansed § 1326 of any discriminatory "taint."

First, Congress amended the INA in 1965 to add a new provision stating: "[n]o person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence[.]"  Immigration and Nationality Act of 1965, Pub. L. No. 89-236, § 2, 79 Stat. 911, 911-12.  This amendment also abolished national-origin quotas and replaced them with a new admission system. <u>Id.</u> § 1, 79 Stat. at 911.  As explained by another court rejecting this same claim, "[e]ssentially, the people themselves adopted amendments to the INA aimed at prohibiting invidious discrimination to remove the 'bad taint' of its prior iterations."  <u>United States v. Gutierrez-Barba</u>, No. CR 19-01224-DJH, 2021 WL 2138801, at *4 (D. Ariz. May 25, 2021).  Indeed, defendant himself recognizes that

22

Congress "acknowledged the discriminatory origins" of 1920s immigration law by passing this amendment.  (Mot. at 15.)

Second, Congress amended § 1326 as part of the Immigration Act of 1990.  "While not specifically referencing the 1929 law or condemning white supremacy or eugenics, the legislative history for the 1990 legislation reveals a 180-degree turn away from the racist tropes that accompanied the enactment of the 1929 immigration law." United States v. Rios-Montano, No. CR 19-2123-GPC, 2020 WL 7226441, at *5 (S.D. Cal. Dec. 8, 2020).  Rather, this legislation reaffirmed the non-discriminatory reasons for passing § 1326.  As one Congressman summarized:

> [The Act would] not disturb the basic reasons for which we have always, and will always, exclude aliens: For cases where aliens have criminal records, when they are public health risks, when they violate drug laws, when they are likely to become economic burdens on the country, or when they have previously violated U.S. Immigration laws.  This is a comprehensive reform of exclusions laws which is a rational accommodation of the concerns of everyone -- from those of the administration to those of civil libertarians.

Id. at *6 (emphasis added) (quoting 136 Cong. Rec. 36,844 (1990)). Notably, the 1990 legislation was supported by politicians and interest groups from across the ideological spectrum, including Nancy Pelosi, Edward Roybal, the Mexican American Legal Defense and Education Fund ("MALDEF"), and the American Civil Liberties Union. Id. at *5-6; see also Abbott, 138 S. Ct. at 2328 (explaining that MALDEF's support was "evidence that the Legislature's objective was reasonable").  Ultimately, "[t]he thorough deliberative process Congress undertook in 1990, combined with the lack of legislative history addressing Section 1325 [or Section 1326], underscores the absence of proof of the 101st Congress's discriminatory intent."

23

<u>Rios-Montano</u>, 2020 WL 7226441, at *6.

  **D. <u>Carrillo-Lopez</u> Is Not Persuasive and Contrary to the Decisions of Every Other Court to Address This Claim**

  This Court should not reach a different conclusion based on the recent decision in <u>United States v. Carrillo-Lopez</u>, --- F. Supp. 3d ----, 2021 WL 3667330 (D. Nev. Aug. 18, 2021).  This decision remains a true outlier -- every other judge to confront defendant's claim has determined that § 1326 is constitutional.  <u>See, e.g.</u>, <u>United States v. Novondo-Ceballos</u>, No. CR 21-383-RB, 2021 WL 3570229 (D.N.M. Aug. 12, 2021); <u>United States v. Machic-Xiap</u>, --- F. Supp. ----, 2021 WL 3362738 (D. Or. Aug. 3, 2021); <u>United States v. Wence</u>, No. CR 20-0027, 2021 WL 2463567 (D.V.I. June 16, 2021); <u>United States v. Gutierrez-Barba</u>, No. CR 19-01224-DJH, 2021 WL 2138801 (D. Ariz. May 25, 2021); <u>United States v. Palacios-Arias</u>, No. CR 20-00062, Dkt. 37 at 3-8 (E.D. Va. Oct. 13, 2020); <u>see also United States v. Rios-Montano</u>, No. CR 19-2123-GPC, 2020 WL 7226441 (S.D. Cal. Dec. 8, 2020) (rejecting identical challenge to 8 U.S.C. § 1325); <u>United States v. Lazcano-Neria</u>, No. MJ 20-4538-AHG, 2020 WL 6363685, at *6-9 (S.D. Cal. Oct. 29, 2020) (same); <u>United States v. Lucas-Hernandez</u>, No. MJ 19-24522-LL, 2020 WL 6161150, at *1-4 (S.D. Cal. Oct. 21, 2020) (same).  This includes Judge Olguin of this District.  <u>See Medina Zepeda</u>, No. CR 20-00057-FMO, Dkt. 33.

  Furthermore, the reasoning of <u>Carrillo-Lopez</u> is simply not persuasive.  At bottom, the court in <u>Carrillo-Lopez</u> concluded that the "racial taint" of the 1929 Act has carried over to § 1326 and -- despite five reenactments by multiple Congresses -- it has yet to be "cleansed."  2021 WL 3667330, *23-25.  Like defendant, that court insists that Congress must "grapple with the racist history of

Section 1326 or remove its influence on the legislation" if it ever wishes to criminalize illegal reentry.  Id. at *24.

As explained above, these contentions are not consistent with Supreme Court precedent.  Again, "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful."  Abbott, 138 S. Ct. at 2324 (cleaned up).  And § 1326 should not be judged based on "legislative history from laws enacted decades earlier."  Medina Zepeda, No. CR 20-00057-FMO, Dkt. 33 at 5.  When § 1326's own history is assessed, the statute passes constitutional muster -- whatever the standard.

### E.    This Court Should Not Hold an Evidentiary Hearing

Defendant's claim fails as a matter of law, so there is no need for an evidentiary hearing.  See United States v. Irwin, 612 F.2d 1182, 1187 (9th Cir. 1980).  What's more, defendant's proposed evidence -- testimony from two historians who have "each written about" the 1929 Act -- would not aid the Court.  (Mot. at 25.)  As explained above, the history of the 1929 Act does not shed light on the reasons that Congress passed § 1326.  And even if it did, it is unclear how these historians could plausibly opine on Congress's motive for passing a law almost 100 years ago.  The Supreme Court has warned that "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork." O'Brien, 391 U.S. at 384.  This Court should decline to hold a hearing that is explicitly centered around such "guesswork."

### IV.  CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court deny defendant's motion to dismiss.