CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
DAVID MENNINGER (Bar No. 281460)
Deputy Federal Public Defender
David_Menninger@fd.org
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
Fredy Stanley Cruz-Ramos

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> FREDY STANLEY CRUZ-RAMOS, <br><br> Defendant. | Case No. CR 19-189-JAK <br><br> **REPLY IN SUPPORT OF MOTION TO DISMISS UNDER EQUAL PROTECTION CLAUSE** <br><br> Date: October 7, 2021 <br> Time: 8:30 a.m. |

Mr. Fredy Stanley Cruz-Ramos, by and through his attorney of Record Deputy Federal Public Defender David Menninger, hereby submits his reply in support of his motion to dismiss the indictment under the Equal Protection Clause.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: September 20, 2021    By  /s/ David Menninger
David Menninger
Attorneys for Fredy Stanley Cruz-Ramos

1

# I. INTRODUCTION

The government does not dispute that Congress passed the original illegal-reentry law for the purpose of discriminating against Latinos. And it does not contest the statistics that show that 8 U.S.C. § 1326 continues to have the effect desired by its original racist proponents. Instead, the government devotes most of its brief to arguing that the law's racist history is irrelevant and functionally unreviewable. Inviting the Court to apply a conceptual framework at odds with controlling precedent, the government asserts that Congress can pass racially animated domestic criminal laws so long as they are rationally related to regulating immigration. Controlling authority contravenes this striking proposition, which would permit overtly racialized criminal punishment for immigrants within our borders.

In the alternative, the government argues that even if the 1929 Act *was* improperly motivated, the reenactment of that law in the Immigration and Nationality Act of 1952 ("1952 Act") removed its racist origins. But the government ignores the fact that Congress explicitly decided to "carr[y] forward" and "substantially reenact[]" the 1929 law into the 1952 Act. Under longstanding Supreme Court precedent, such pro forma recodifications do not detach a law from its original intent.

That leaves the government to argue, circularly, that because enforcement efforts have continued overwhelmingly to target Mexicans, Latinos, and the Southern border, the law's disparate effect is simply a product of geography. But all that *Arlington Heights* requires is that the law continue to "bear more heavily[]" on Mexicans and Latinos. Given the overwhelmingly-lopsided statistics, that can hardly be disputed.

While the government may seek to play it down, the disturbing reality is that, in a moment of eugenical zeal, Congress enacted a federal criminal law targeting Latinos. The intended effects of that law have reverberated across generations, tracing a straight line from 1929 to today. For the reasons above and below, the Court should find that

§ 1326 violates equal protection under *Arlington Heights*, or, at a minimum, hold a hearing to determine whether Congress would have passed the 1929 law without this discriminatory intent.

## II. ARGUMENT

### A. Contrary to the government's arguments, the *Arlington Heights* framework applies

Seeking to dodge *Arlington Heights*'s well-established framework for evaluating whether a facially neutral law was enacted for a racially discriminatory purposes, the government argues instead for an extremely deferential, rational-basis review. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977). The government contends that this soft-handed approach to racial discrimination is warranted when legislation touches upon immigration—in other words, that Congress has wide berth to pass laws criminalizing illegal presence in the United States *expressly for the purpose* of discriminating against a particular racial group. This is a staggering argument, seemingly at odds with the government's high-profile commitment to eradicating the pernicious effects of racism in the criminal justice system.[1] Thankfully, the government is simply wrong on the law.

First, the government argues that under *United States v. O'Brien*, 391 U.S. 367 (1968), a Court is prohibited from looking at the purpose of a statute, even if it was expressly designed for purposes of racial discrimination. But *O'Brien* was not an Equal Protection case: rather, it dealt with the First Amendment. *Id.* at 376 (stating that the challenger argument that the statute was "unconstitutional as enacted because what he calls the purpose of Congress was to suppress freedom of speech") (internal quotations

---

[1] *See, e.g.*, "Garland commits to combatting systemic racism," The Hill, February 21, 2011, https://thehill.com/homenews/senate/539911-garland-commits-to-combatting-systemic-racism?rl=1 ; Remarks by President Biden on the Verdict in the Derek Chauvin Trial for the Death of George Floyd, April 20, 2011, https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/04/20/remarks-by-president-biden-on-the-verdict-in-the-derek-chauvin-trial-for-the-death-of-george-floyd/ ("And this takes acknowledging and confronting, head on, systemic racism and the racial disparities that exist … in our criminal justice system more broadly.").

omitted).[2] Thus, *Arlington Heights* and *O'Brien* are not in tension: while intentionally-discriminatory-but-facially-neutral statutes may violate Equal Protection, a court faced with a First Amendment challenge cannot invalidate a statute based on the legislature's intent alone. Since Mr. Cruz-Ramos's is an Equal Protection challenge, *Arlington Heights* controls, and *O'Brien* is inapposite. And even if there were a conflict, *Arlington Heights* would control, because it followed *O'Brien* by nine years. Thus, *O'Brien* presents no obstacle to Mr. Cruz-Ramos's argument.

The government next argues that, in light of Congress's power to regulate immigration, it is of no moment whether the Congress passed § 1326—a criminal law affecting persons "found in" the United States—for the *express purpose* of discriminating against Latinos. Fortunately, this argument is contradicted by Ninth Circuit precedent. The government acknowledges that the Ninth Circuit has recently twice applied the *Arlington Heights* framework to evaluate immigration actions affecting in-country individuals: the suspension of Deferred Action for Childhood Arrivals program and the decision to not renew Temporary Protected Status for nationals of certain countries. *Regents of the Univ. of Cal. v. Dep't of Homeland Sec.*, 908 F.3d 476 (9th Cir. 2018), *aff'd in part and rev'd in part*, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020); *Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020). The government ignores, however, the central reason why the Ninth Circuit applied *Arlington Heights*, in contrast to less stringent review affecting claims of individuals *outside* our nation's borders: "The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Ramos*, 975 F.3d at 896 (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693, (2001)). Because the affected individuals in *Ramos* and *Regents* were in the United States, the Ninth Circuit applied *Arlington* Heights, rather than the greater deference warranted for actions affecting "the admission and exclusion of foreign

---

[2] The same is true of *Menotti v. City of Seattle*, 409 F.3d 1113, 1130 n.29 (9th Cir. 2005).

4

nationals" outside our borders. *Ramos*, 975 F.3d at 895 (internal quotation omitted). The statute at issue here does not affect whether individuals outside the United States are admitted or excluded: it dictates that individuals *inside* the United States may be subjected to criminal punishment. Accordingly, under *Ramos*, the *Arlington Heights* framework applies.[3]

*Arlington Heights* thus answers the first question of the traditional three-question framework for evaluating any equal-protection challenge: (1) what is the classification, (2) what level of scrutiny applies to the classification, and (3) does the challenged government action withstand the level of scrutiny? Chemerinsky, *Constitutional Law* 670-73 (3d ed. 2006). For question one, *Arlington Heights* analysis recognizes that sometimes discriminatory animus exists, even when it is not present in the text of the challenged law. In that posture, *Arlington Heights* offers another way of showing that, in fact, a law classifies at least partly along prohibited lines. 429 U.S. at 266-68. Once that showing is made, whether under *Arlington Heights* or otherwise, racial or ethnic discrimination always subjects a law to strict scrutiny, even for a facially neutral law that makes no mention of race. *Washington v. Davis*, 426 U.S. 229, 241-42 (1976). In this case, surviving that scrutiny requires showing that the illegal-reentry provision in the 1929 Act would have passed "even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 265-66 & n.21.

This Court should thus reject the government's attempt to shirk the appropriate standard.

**B.    8 U.S.C. § 1326 was a reenactment of the Undesirable Aliens Act of 1929**

---

[3] The government tries to distinguish *Regents* and *Ramos* on the ground that they affected only individuals with "clean criminal records." That is not true. An applicant can qualify for either DACA or TPS despite two misdemeanor convictions. 8 U.S.C. § 1254a(c)(2)(B)(i); USCIS, "Consideration of Deferred Action for Childhood Arrivals (DACA)", https://www.uscis.gov/DACA (last visited September 19, 2021). Moreover, over 40 percent of individuals prosecuted for illegal reentry have "little of no prior criminal history." U.S.S.C., "Quick Facts: Illegal Reentry Offenses, Fiscal Year 2020," https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY20.pdf.

The government does not dispute that the original illegal-reentry law—the Undesirable Aliens Act of 1929—was enacted for a racially discriminatory purpose. The government maintains, however, that Congress's intent in criminalizing illegal reentry in the first place is of little relevance because Congress has subsequently recodified the law. This is wrong. As Mr. Cruz-Ramos explained in his motion, the recodification or reenactment of an earlier statute does not shift the focus of the *Arlington Heights* analysis; courts should look to the intent of the legislature that wrote the law in the first place, not the legislature that merely reorganized or repackaged it. And that is precisely what took place in 1952 and each subsequent enactment of the illegal-reentry law: Congress merely recodified the statute—expressly "carr[ying] forward" the 1929 Act—with only substantive changes to extend the law's reach or heighten its penalties.

The government seems to contend that as long as a legislature places an older law into a new larger package, or makes some alteration to the statutory text, that reenactment then becomes the sole focus of the *Arlington Heights* inquiry. At the core of the government's argument is a misreading of *Abbott v. Perez, 138 S. Ct. 2305 (2018)*, a misreading which Mr. Cruz-Ramos dispelled in his motion. The challenge legislative enactment in *Abbott* was not a reenactment or a recodification of an earlier discriminatory law; it was a *new* enactment. *Id.* at 2325 ("The 2013 Texas Legislature did not reenact the plan previously passed by its 2011 predecessor."). The *Abbott* District Court had relied on the legislature's intent in enacting a 2011 legislative map to invalidate a 2013 map that "departed significantly" from the 2011 version. *Id.* at 2316. It is as if the District Court struck down a ban on loitering because that the state legislature had, two years earlier, enacted a discriminatory poll tax. It was in that context that the Supreme Court held that the "discriminatory taint" from one law could not invalidate a distinct statute. *Id.* at 2325. And indeed, *Abbott*'s author, Justice Alito, subsequently wrote a Court may properly examine a law's original motives even where legislators had "readopted their rules under different circumstances in later

6

years." *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2268 (2020) (Alito, J., concurring) (quotations omitted).[4]

That is not the scenario at issue here. In 1952, Congress did not fundamentally reconsider or rewrite the illegal-reentry law that existed; rather, it plucked the discriminatory 1929 law and repackaged it within the larger Immigration and Nationality Act. Indeed, Congress expressly said that it was doing that: the Senate Report on the bill recommended that "[t]he provision relating to reentry after deportation should be carried forward[.]" Exhibit O at 656; *compare Abbott*, 138 S. Ct. at 2325 (noting that the 2013 Texas Legislature did not "used criteria that arguably *carried forward* the effects of any discriminatory intent on the part of the 2011 Legislature) (emphasis added).

The only real change that the 1952 Congress made was, as the government notes, to add in the "found in" provision, so that the law could be applied more broadly. As Mr. Cruz-Ramos pointed out in his motion, that change was advocated by Attorney General Payton Ford in a letter in which he referred to migrants as "wetback[s]." *See* Exhibit P at 718. The government offers no good explanation why that expansion-- written into law for reasons plainly tainted with racism--should divert the Court's focus from the discriminatory original law.[5] Thus, because the 1929 Act was indisputably racially motivated, and because that law remains the appropriate focus of the inquiry, the Court should grant the motion.

C. **§ 1326 continues to bear more heavily on Latinos, which is all that *Arlington Heights* requires to show disparate impact**

---

[4] The government brushes off these statements as dicta, but here too the government is contradicted by Justice Alito. Rather, in the words of Justice Alito, this approach is "now precedent." *Espinoza*, 140 S. Ct. at 2259.

[5] As Mr. Cruz-Ramos argued in his motion, he can prevail even if this Court focuses on the 1952 law, particularly in light of Attorney General Ford's letter. The government's argument to the contrary relies on statutory interpretation cases eschewing the use of legislative history. But the question under *Arlington Heights* is not what the law means, but what the legislature intended. For that reason, it demands scrutiny of legislative history. Attorney General Ford urged Congress to adopt § 1326 for reasons intertwined with racism, and Congress followed his recommendation. That is certainly probative of discriminatory intent.

The government does not contest Mr. Cruz-Ramos's statistics showing that Latino defendants have made up nearly all of the people charged and convicted under § 1326. Instead, it claims that the disparate impact is a product of geography, not discrimination. But this argument conflates the law's *reasons* with it's *results*. The government cannot dispute that § 1326 "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266. That is all that is required, since a law violates equal protection if its "original enactment was motivated by a desire to discriminate" and it "continues to this day to have that effect." *Hunter*, 471 U.S. at 233.

In *Hunter*, for instance, the law's challengers showed that Alabama's provision originally "disfranchised approximately ten times as many blacks as whites." *Id.* at 227. The challengers also showed that "[t]his disparate effect persists today" because "blacks are by even the most modest estimates at least 1.7 times as likely as whites to suffer disfranchisement." *Id*. That was all that was necessary to show disparate impact. *See id.* at 227–33. The law's challengers did not have to show that white and black people committed the relevant disenfranchising misdemeanors at similar rates or disprove any other reason that the law disproportionately disenfranchised black people.

Here, Mr. Cruz-Ramos easily clears this threshold. As the moving papers show, in the years following the 1929 law's passage, Mexicans comprised a huge proportion of those prosecuted and convicted under modern-day § 1326. Today, Latinos continue to make up 99% of all people prosecuted under the law. Under *Arlington Heights* and *Hunter*, is irrelevant whether § 1326's present disparate impact is a product of "geography" or "discrimination." All that matters is that it *does* overwhelmingly impact Mexican and Latino communities today.

On this point, the government's mischaracterizes the Supreme Court's opinion in *Regents*. In *Regents*, the plurality held that disparate impact was not *alone* enough to make up an entire *Arlington Heights* claim, as there was "nothing irregular about the history leading up" to DACA's rescission, and public officials' statements there were "unilluminating" on the question of discriminatory purpose. 140 S. Ct. at 1915-16. That

simply reiterated the holding of *Arlington Heights* that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." 429 U.S. at 264-65 (citing *Davis,* 426 U.S. 229). It did not undermine the basic premise of *Hunter*: that disparate impact is evaluated by whether a law continues to have the racist effect its *original* enactors intended–not whether its current disparate impact is motivated by a *current* desire to discriminate. *See Hunter*, 471 U.S. at 233.

Of course, if that *were* the standard, the government's "geography" argument is more than a little circular given that the United States has many borders and immigrants from many countries, yet has consistently focused its enforcement efforts in just one direction. *See, e.g.*, U.S. Dep't of Justice, Statements of AG Sessions (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry ("[T]he Department of Homeland Security is now referring 100 percent of *illegal Southwest Border crossings* to the Department of Justice for prosecution. And the Department of Justice will take up those cases.") (emphasis added).

Moreover, almost every claim of disparate impact under *Arlington Heights* could be characterized as a "product of geography." For instance, the Ninth Circuit has held that planning decisions made with a racist purpose in predominantly- or trending-Latino neighborhoods have disparate impacts on Latino people, *The Comm. Concerning Commun. Improvement v. City of Modesto*, 583 F.3d 690, 704-06 (9th Cir. 2009), and that that educational decisions made with a racist purpose in a predominantly Latino city have a disparate impact on Latino students, *Arce*, 793 F.3d at 978. If the government's "geography" theory were correct, these plaintiffs could never have shown a disparate impact, yet the Ninth Circuit held in each case that they could.

## III. CONCLUSION

For the reasons above and elsewhere, the Court should dismiss the Indictment. Alternatively, it should convene an evidentiary hearing to determine whether, as the government now claims, Congress would have passed the illegal-reentry provisions of the 1929 Act without any prohibited intent.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: September 20, 2021    By  /s/ David Menninger
David Menninger
Attorneys for Fredy Stanley Cruz-Ramos